612 F.2d 766
 Jerry Wayne RHODES, Appellant,
v.
William B. ROBINSON, Lowell D. Hewitt, Richard D. Kelly,
Dennis R. Erhard, Terry W. Henry, David P. Malone, Steve G.
Polte, Charles D. Rodgers, Eugene C. Wicker, Gilbert N.
Mountain, Sgt. Varner, B. Lear, James O. Miller, Richard I.
Norris, James Morder, Lieutenant Myers, Appellees.
 No. 78-2525.
 United States Court of Appeals,
Third Circuit.
 Submitted Under Third Circuit Rule 12(6) Sept. 17, 1979.
Decided Dec. 28, 1979.
 
 Jerry Wayne Rhodes pro se.
 Michael H. Garrety, Deputy Atty. Gen., Commonwealth of Pennsylvania, J. Andrew Smyser, Deputy Atty. Gen., Gerald Gornish, Atty. Gen., Dept. of Justice, Harrisburg, Pa., for appellees.
 Before SEITZ, Chief Judge, and GIBBONS and WEIS, Circuit Judges.
 OPINION OF THE COURT
 SEITZ, Chief Judge.
 
 
 1
 Appellant, Jerry Wayne Rhodes, a prisoner at Pennsylvania's State Correctional Institution at Huntingdon, filed this suit Pro se under 42 U.S.C. § 1983 (1976) to redress a series of violations of his constitutional rights. The complaint includes ten claims and names as defendants the commissioner of Pennsylvania's Bureau of Corrections, the superintendent and two deputy superintendents of the Huntingdon facility, and several of Huntingdon's officers and guards. The complaint prayed for declaratory and injunctive relief and for damages.
 
 
 2
 The defendants moved for summary judgment on all ten claims. The district court granted their motion on nine and allowed Rhodes to proceed to trial on the remaining claim.[1] With the trial now completed, Rhodes appeals from the grants of summary judgment.
 
 
 3
 Because Rhodes bases each claim on allegations of largely distinct facts, we shall consider each separately.
 
 
 4
 I. Prohibition of Legal Assistance to Other Prisoners
 
 
 5
 In the first claim of his complaint, Rhodes objects to a restriction on his duties as a clerk in the prison law library. The restriction prohibited him from assisting other prisoners in the preparation of their legal materials while on duty. Rhodes argues that this restriction is a barrier to other prisoners' access to courts and a violation of their rights under the due process clause. See Wolff v. McDonnell, 418 U.S. 539, 577-80, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969). The district court dismissed the claim on the ground that Rhodes lacked standing to assert the due process rights of his fellow prisoners.
 
 
 6
 The Supreme Court has disregarded the rule against Jus tertii, the vicarious assertion of rights, in numerous cases involving constitutional rights. One important exception arises when enforcement of a legal rule will interfere with the rights of third parties who lack an effective means of asserting their own rights, but the person against whom the rule is enforced does not. An example of this exception is Eisenstadt v. Baird, 405 U.S. 438, 443-46, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972). In a prosecution of a seller of contraceptive foam for violating a statute that prohibited the distribution of contraceptives, the Court permitted the seller to challenge the statute on the grounds of the privacy rights of unmarried users. The Court noted that enforcement against the seller would "materially impair the ability of single persons to obtain contraceptives." Id. at 446, 92 S.Ct. at 1034. Since the users were not themselves subject to prosecution, they lacked a similar forum in which to assert their own rights. Id. See also Craig v. Boren, 429 U.S. 190, 195-97, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976); Barrows v. Jackson, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953). In Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969), the Court heard a prison writ writer assert the rights of his fellow prisoners to receive assistance necessary for effective access to habeas corpus relief. Although the Court made no mention of the standing aspect of the case, it implicitly recognized Jus tertii in a situation closely analogous to the present case.
 
 
 7
 The circumstances of the present case justify a recognition of Rhodes's standing. We can take notice of the fact that many prisoners are unable to prepare legal materials and file suits without assistance. The record contains some examples of Rhodes having provided the assistance required by a few such prisoners. The challenged restriction, therefore, might materially impair the ability of some prisoners to file civil rights actions. Suits by these prisoners to protect their own rights of access to courts would be difficult because, as alleged, they would require the assistance of someone like Rhodes to bring such a suit.
 
 
 8
 Appellees argue that the challenged restriction does not, in fact, impede any prisoner's access to courts in civil rights actions. Because the district court relied entirely on its ruling on the standing issue to dismiss this claim, we decline to consider this argument. The responsibility for finding that no genuine issue of fact exists on any element of the plaintiff's claim lies initially with the district court. Accordingly, we will vacate the grant of summary judgment.II. Denial of Use of the Photocopying Machine
 
 
 9
 In his second claim, Rhodes objects to a denial of his request to photocopy certain papers concerning a prior criminal conviction of a guard named Dean Forshey. He claims that he intended to send copies of the papers to members of the Pennsylvania legislature who were investigating conditions at the Huntingdon facility. However, the superintendent was informed that Rhodes intended to distribute copies to other prisoners and feared that the distribution would reduce Forshey's effectiveness as a guard. Pursuant to a general policy to permit prisoners to photocopy documents only if necessary for a lawsuit, communication with public officials, or a rehabilitation program, the superintendent refused to allow the photocopying.
 
 
 10
 The selective denial of photocopying privileges amounts to censorship of a prisoner's speech. With any such denial, the superintendent reduces a prisoner's ability to communicate through written materials. The reason for the action is the superintendent's disapproval of the communication itself. Consequently, this action is subject to scrutiny under the first amendment: it must further "an important or substantial governmental interest . . . unrelated to the suppression of free expression," and the restriction must be "no greater than is essential to the furtherance of that interest." United States v. O'Brien, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968). In the case of a restriction on prisoners' speech, the recognized governmental interests are: "the preservation of internal order and discipline, the maintenance of internal security against escape or unauthorized entry and the rehabilitation of the prisoners." Procunier v. Martinez, 416 U.S. 396, 412, 94 S.Ct. 1800, 1811, 40 L.Ed.2d 224 (1974). See also Jones v. North Carolina Prisoners' Union, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977). Furthermore, when a prison official exercises discretion to restrict prisoners' free speech, the first amendment might require the existence of written regulations to govern his discretion. See Main Road v. Aytch, 522 F.2d 1080, 1088-90 (3d Cir. 1975).
 
 
 11
 Nothing in the record disputes the superintendent's statement that he acted on information that Rhodes intended to distribute copies of the papers to other prisoners. Rhodes does not allege that the superintendent was aware of his intention to send copies to state legislators. Rather, he admits that he concealed this intention. Before the denial of the photocopying privileges, the prison librarian, acting on behalf of the superintendent, asked Rhodes how he planned to use the copies. Rhodes refused to answer the question.
 
 
 12
 In this situation, Rhodes's asserted intention to send copies to state legislators cannot supply the basis of a first amendment violation. There will arise instances in which prison officials may restrict prisoners' speech to serve some countervailing interest. See Jones v. North Carolina Prisoners' Union, supra. We would unnecessarily restrict the ability of prison officials to take such actions if we did not allow them to base their decisions on information reasonably available to them. Here, the superintendent gave Rhodes a fair opportunity to explain his need for the copies, and he declined to take advantage of that opportunity. We will not then require the superintendent to justify his action in light of Rhodes's secret intention.
 
 
 13
 There remains an issue of the validity of the superintendent's decision as a restriction on the distribution of copies to other prisoners. The district court seems to have overlooked the first amendment basis of Rhodes's objection to this action. The court dismissed the claim because Rhodes failed to show "(s)ome interference with an inmate's right of access to the Court" and because prisoners, as a matter of law, "have no absolute right of access to a photocopy machine." There is no indication that the court applied the first amendment criteria which justify the restriction on the distribution of copies. Consequently, we must vacate the grant of summary judgment.III. Destruction of Law Books
 
 
 14
 Rhodes's fourth claim alleges that prison officials interfered with his access to courts by discarding eleven or more volumes from the prison law library. The volumes appear to have been all out-of-date advance sheets and supplementary pamphlets.
 
 
 15
 The controlling case is Bounds v. Smith, 430 U.S. 817, 828, 97 S.Ct. 1491, 1498, 52 L.Ed.2d 72 (1977), which held that a prisoner's right of effective access to courts included a right to "adequate law libraries or adequate assistance from persons trained in the law." In applying Bounds, the focus should not be on the volumes that were discarded but on the adequacy of the volumes that remain in the library, or, in the absence of an adequate law library, on the sufficiency of alternative legal assistance. Rhodes alleges no facts relevant to either of these matters, and we cannot, even with a generous reading of his complaint, infer such allegations. Rhodes plainly relies on the premise that a prison law library never may discard a law book, even if the book is replaced with a more current volume. This proposition has no arguable support in the Constitution or federal law. The district court properly granted summary judgment for defendants on this claim.
 
 IV. Profiteering on the Photocopying Machine
 
 16
 In this claim, Rhodes alleges that the prisoners paid a price for photocopying that resulted in a profit to the prison administration. He claims that this profiteering violated his rights under the Constitution and under Pennsylvania law.
 
 
 17
 It is conceivable that profiteering on a prison photocopier could make copying prohibitively expensive and effectively deny prisoners the enjoyment of certain constitutional rights, such as free speech or access to courts. See Part II Supra; McDonald v. Illinois, 557 F.2d 596, 603 (7th Cir.), Cert. denied, 434 U.S. 966, 98 S.Ct. 508, 54 L.Ed.2d 453 (1977). However, we find no basis in the Constitution or federal law for challenging transactions between a prison and its inmates simply because the transactions return a profit to the prison administration.
 
 
 18
 Rhodes does not allege that the profit-making had any impact on his constitutional rights aside from the asserted right to make photocopies at a price that does not include a profit margin. He, therefore, fails to state a claim under federal law. Whether or not he states a claim under Pennsylvania law is irrelevant. Absent a cause of action arising under federal law, the district court lacked pendent jurisdiction to hear a state law claim. United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).
 
 
 19
 V. Emotional Harm Caused by the Beating of Another Prisoner
 
 
 20
 In his sixth claim, Rhodes seeks to recover for emotional distress suffered as a result of overhearing three guards administer a gruesome beating to an inmate confined two cells away from him. He bases his claim on the eighth amendment and on Pennsylvania law. The district court held that Rhodes's allegations fail to state a federal cause of action.
 
 
 21
 Although we can find no case that allows redress under the Constitution for the emotional harm that Rhodes asserts, his claim is not without arguable support. The eighth amendment's proscription of cruel and unusual punishment prohibits the wanton and unnecessary infliction of pain upon persons in custody. See Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (deliberate withholding of necessary medical treatment); Howell v. Cataldi, 464 F.2d 272 (3d Cir. 1972) (beating in the course of an interrogation). The test of "cruel and unusual" is a strict one which considers whether the infliction grossly exceeds the legitimate need for force and violates the standards of contemporary society. See Furman v. Georgia, 408 U.S. 238, 282, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Brennan, J., concurring), Followed in Hodges v. Klein, 562 F.2d 276, 278 (3d Cir. 1977) (per curiam).
 
 
 22
 Some courts have refused to treat as punishment under the eighth amendment conduct that is not ostensibly intended to serve some legitimate penal objective. They have, nonetheless, found a proscription of the same wanton and unnecessary infliction of pain in the due process clause. See Curtis v. Everette, 489 F.2d 516, 518-19 (3d Cir. 1973), Cert. denied, 416 U.S. 995, 94 S.Ct. 2409, 40 L.Ed.2d 774 (1974) (prison guard prevented an inmate from defending himself against an attack from another inmate); Johnson v. Glick, 481 F.2d 1028 (2d Cir.), Cert. denied, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973) (beating and denial of necessary medical care). The test under the due process clause is whether the conduct "shocks the conscience." Rochin v. California, 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952).
 
 
 23
 As we read these cases, the critical element of each constitutional violation is not the nature of the plaintiff's injury but the manner of the infliction of that injury. The protection of fundamental liberties by the due process clause and the eighth amendment extends to protection from an official's abusive exercise of his powers to inflict grossly undue harm. Thus, we cannot find Rhodes's claim insufficient because it alleges emotional rather than physical harm. Emotional distress can produce injury of the same severe magnitude as occurred in the cases of physical harm and withholding necessary medical care, and it can be inflicted in the same wanton and unreasonable manner.
 
 
 24
 However, we still find Rhodes's claim insufficient. Implicit in the concept of an official's wanton and unnecessary infliction of harm is some improper state of mind. Where a person suffers injury as an incidental and unintended consequence of official actions, the abuse of power contemplated in the due process and eight amendment cases does not arise. We need not define the requisite state of mind, because Rhodes's complaint lacks any allegation relevant to this issue. He does not allege that the three guards even were aware that Rhodes was within hearing range when they administered the beating to Rhodes's fellow inmate. Nor can we reasonably infer an allegation of knowledge, intent, or recklessness from facts stated in the complaint. Without an allegation of this necessary element, Rhodes fails to state a claim under the Constitution.
 
 
 25
 As with the previous claim, the insufficiency of the federal claim means that the district court had no pendent jurisdiction to consider the related claim under Pennsylvania law. United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). We find no error in the dismissal of the sixth claim.
 
 VI. Threatened Punishment
 
 26
 In this claim, Rhodes charges that defendants threatened to punish him in retaliation for communicating with public officials and for filing lawsuits. The district court found these allegations "vague and conclusory," and dismissed the claim.
 
 
 27
 The defendants' motion for summary judgment contained their first objection to the lack of specificity in this claim. At this point, the record contained not only the complaint but also defendants' answers and affidavits of the parties supporting and opposing summary judgment. In this situation, the district court should consider the entire record when determining whether a plaintiff's allegations are vague and conclusory. The purpose of the requirement of specificity in civil rights complaints is to weed out frivolous and insubstantial claims. See Rotolo v. Borough of Charleroi, 532 F.2d 920, 922 (3d Cir. 1976). This purpose is not well served by limiting consideration to the complaint and ignoring later submissions that provide the necessary specificity.
 
 
 28
 However uncertain Rhodes's complaint may have been, his affidavits thoroughly cure the defect. In these affidavits, he alleges that he was removed from his position in the prison library, subjected to misconduct charges in February and March of 1978, and denied treatment of an ear infection, all in retaliation for his activities in communicating with members of the Pennsylvania legislature and in filing civil rights actions against prison officials. The detailed narrative of events in these affidavits fully refutes any characterization of Rhodes's charges as "vague and conclusory." Moreover, in support of his claim Rhodes might prove that these actions improperly burdened his first amendment right to communicate with members of the legislature and interfered with his due process right of access to courts for redress of violations of his civil rights. See Bounds v. Smith, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977); Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); Procunier v. Martinez, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). The dismissal of this claim must be vacated.
 
 VII. Impartial Hearing Committee
 
 29
 Rhodes's eighth claim alleges that defendants denied him the benefit of an impartial panel to hear charges of misconduct brought against him. He argues that the presence on the hearing committee of an officer of the guards, Captain Wicker, destroyed impartiality.
 
 
 30
 We have ruled that "the requirement of an impartial tribunal prohibits only those officials who have a direct personal or otherwise substantial involvement, such as major participation in a judgmental or decision-making role, in the circumstances underlying the charge from sitting on the disciplinary body." Meyers v. Alldredge, 492 F.2d 296, 306 (3d Cir. 1974); Accord, Wolff v. McDonnell, 418 U.S. 539, 592-93, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (Marshall, J., concurring and dissenting). Wicker's first affidavit states that the misconduct charges against Rhodes were prepared by another officer. In his second affidavit, Wicker says: "I had no involvement in the facts outlined in (the) misconduct report . . . (,) nor did I witness the (occurrence)." Rhodes submitted no affidavits or documents to refute these facts and alleges no further facts relevant to impartiality. Thus, undisputed facts establish that the hearing board satisfied the requirements of due process. The district court's grant of summary judgment was correct.
 
 VIII. Statements to the Hearing Committee
 
 31
 Rhodes raises a second due process objection to the disciplinary proceeding in his ninth claim. According to this claim, after he and his inmate assistant left the area of the hearing committee, a security officer, Charles D. Rodgers, spoke to the committee about Rhodes's misconduct. In granting summary judgment for defendants, the court noted that Rhodes has not alleged in his complaint or in any of his affidavits that he had "any personal knowledge of the subject of Captain Rodgers' address to the Committee." From this the court concluded that "Rhodes would be unable to prove any facts in support of his contention."
 
 
 32
 As a preliminary matter, we must note the error of the district court's basic approach to the summary judgment motion. Rule 56(c) says that the court shall consider whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The rule does not provide for summary judgment when the district court merely concludes that the opposing party lacks the ability to submit further evidence in support of his contentions.
 
 
 33
 In support of the grant of summary judgment, appellees point to the statement that Rodgers made in his affidavit: "I did not give testimony or recommendations of the disposition of misconduct number 16039 which was written on inmate Jerry Rhodes." They also point to the affidavit of the chairman of the hearing committee, Captain Wicker, which supports Rodgers's statement: "Rodgers did not participate in the hearing committee."
 
 
 34
 The contents of some other affidavits, however, support Rhodes's allegations. The affidavit of an inmate named Ancell Hamm states that Hamm observed the hearing area after Rhodes and his inmate assistant had left and saw "Captain Rodgers standing before the Hearing Committee and talking to them." Further evidence shows that Rodgers had previously formed an intention or disposition to speak to the committee about the misconduct. Rhodes's inmate assistant said in his affidavit that just prior to his and Rhodes's departure from the hearing area "Captain Rodgers stated that he had something to say about this hearing." In Rhodes's own affidavit, he reports seeing Rodgers read the misconduct report, discuss it with other prison officials, and show signs of disapproval of Rhodes's misconduct. Evidence of a person's intent or disposition is admissible to show that the person subsequently acted in conformity with that intention or disposition. See Mutual Life Insurance Co. v. Hillmon, 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706 (1892). From these affidavits a factfinder could conclude that Rodgers addressed the committee on the subject of Rhodes's misconduct. Therefore, Rhodes has shown the existence of a genuine issue of fact.
 
 
 35
 Furthermore, the issue is material to Rhodes's claim that the hearing procedures failed to meet the requirements of due process. In Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), the Supreme Court held that due process in a prison disciplinary proceeding requires "a 'written statement by the factfinders as to the evidence relied on and the reasons' for the disciplinary action." Id. at 564, 94 S.Ct. at 2979 (Quoting Morrissey v. Brewer, 408 U.S. 471, 489, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)). In order to ensure adequate review of a hearing committee's decision and to protect a prisoner from undue collateral consequences of a committee's decision, Wolff requires that the statement be complete unless exigent circumstances require special exclusions. The report of the hearing committee in Rhodes's case makes no mention of either Rodgers's testimony or any omissions. If, in fact, the committee heard and considered Rodgers's testimony, the Wolff requirement of a complete statement of evidence relied upon has not been met. The grant of summary judgment on this claim must be vacated.
 
 IX. Excessive and Inequitable Punishment
 
 36
 Rhodes's third and final objection to the misconduct proceedings concerns the punishment received. The facts underlying this claim are undisputed. Rhodes's misconduct was to engage in a heated argument with another inmate, Peter Melnyozenko, during the course of which he threatened to kill Melnyozenko. For this conduct, he was placed in "Administrative Custody Maximum," which is confinement segregated from the rest of the prison population, and dismissed from his job in the prison law library. The hearing committee also recommended that Rhodes be transferred to another prison. Rhodes was released from administrative custody after about a month. He complains that his punishment was excessive and greater than the punishment received by other prisoners for similar offenses.
 
 
 37
 Punishment is unconstitutional only if it violates the eighth amendment's standard of cruel and unusual punishment. We previously have relied upon Mr. Justice Brennan's cumulative test for applying the cruel and unusual standard:
 
 
 38
 If a punishment is unusually severe, if there is a strong probability that it is inflicted arbitrarily, if it is substantially rejected by contemporary society, and if there is no reason to believe that it serves any penal purpose more effectively than some less severe punishment . . . .
 
 
 39
 Furman v. Georgia, 408 U.S. 238, 282, 92 S.Ct. 2726, 2748, 33 L.Ed.2d 346 (1972) (Brennan, J., concurring), Cited in Hodges v. Klein, 562 F.2d 276, 278 (3d Cir. 1977) (per curiam). Considering the seriousness of a threat to kill and the problems that this type of conduct can cause for prison order and security, the punishment that Rhodes received is not excessive to the severe degree contemplated in this reading of the eighth amendment.
 
 
 40
 In support of his charge of inequity, Rhodes offers one other case of inmate misconduct: his adversary Melnyozenko and an inmate named McCool were charged with fistfighting. A hearing board found that McCool started the fight, placed him in administrative custody for thirty days, and dismissed the charges against Melnyozenko. Because the punishment handed down in any case of prisoner misconduct is determined on the basis of the facts of the particular case, the equal protection clause cannot require exact uniformity in degrees of punishment. However, we need not consider what particular constraints equal protection might place on prisoner discipline. At the very least, the prisoner challenging punishment as inequitable must demonstrate disparities in punishment that are not reasonably related to legitimate state interests. See Hodges v. Klein, 562 F.2d 276, 278 (3d Cir. 1977) (per curiam). The prison administration could reasonably conclude that a threat to kill poses a greater danger to the maintenance of order and security than does a fistfight. Thus, the disparity in this case is not a constitutional violation.
 
 
 41
 The district court correctly found that defendants were entitled to judgment as a matter of law.
 
 X. Conclusion
 
 42
 The grants of summary judgment on claims 1, 2, 7, and 9 will be vacated and remanded for further proceedings. The grants of summary judgment on claims 4, 5, 6, 8, and 10 will be affirmed.
 
 
 
 [1]
 In that claim, Rhodes charged a guard with removing legal materials and personal property from his cell. The district court tried the case before a jury. The jury returned a verdict for Rhodes and found damages of $5.00. The court entered judgment for that amount. Neither side appeals from that judgment