ST. CLAIRE, Frank "X", Appellant
in No. 80–1077,

v.

CUYLER, Julius, Individually; Walker, Individually; D. C. Wampole, Individually; Martin Dragovich, Individually; R. H. Spaid, Individually; James Thrash (Turner), Individually; John Burroughs, Individually.

ST. CLAIRE, Frank "X",

v.

CUYLER, Julius, Individually; Walker, Individually; D. C. Wampole, Individually; Martin Dragovich, Individually; R. H. Spaid, Individually; James Thrash (Turner), Individually; John Burroughs, Individually,

Julius Cuyler, William Walker, Dennis Wampole, Martin Dragovich, Robert Spaid, James Thrash and John Burroughs, Appellants in No. 80–1078.

Nos. 80–1077, 80–1078.

United States Court of Appeals,
Third Circuit.

Dec. 5, 1980.

Before SEITZ, Chief Judge, and ALDISERT, ADAMS, GIBBONS, ROSENN, HUNTER, WEIS, GARTH, HIGGINBOTHAM and SLOVITER, Circuit Judges.

## SUR PETITION FOR REHEARING

ALDISERT, Circuit Judge.

The petition for rehearing filed by Frank "X" St. Claire in the above entitled case having been submitted to the judges who participated in the decision of this court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is denied.

Chief Judge Seitz and Judges Adams, Gibbons, Higginbotham and Sloviter would grant the petition for rehearing.

## OPINION SUR DENIAL OF PETITION FOR REHEARING

ADAMS, Circuit Judge.

I.

I dissent from the denial of the petition for rehearing because in my view this case should be reheard before the Court in banc. This is so since the decision by the panel would appear to overrule previous holdings by this Court, to misapply Supreme Court opinions that do not consider the extent of prisoners' rights to observe their religion, and to transgress the precept that reviewing courts shall respect the factual findings of trial courts.

II.

The right to exercise freely the religion of one's choice is, of course, among the most jealously guarded in the pantheon of constitutional protections.[1] The panel denominates as a "truism" the principle that "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement." 3 Cir., 634 F.2d 109 at 112. This axiom undoubtedly extends to the First Amendment right to observe the tenets of a freely chosen and sincerely held religious faith. *Cruz v. Beto*, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). Under the standard applied by the panel, however, this truism is denuded of any real content. Instead, the panel holds that "the state needs only to produce evidence that to permit the exercise of first amendment rights would create a *potential* danger to institutional security." At 114 (emphasis added). Such a standard would seem to exhibit a

1. Chief Justice Burger stated, in a case outside the prison context, that it is firmly established that "only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion." *Wisconsin v. Yoder*, 406 U.S. 205, 215, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972). See also *McDaniel v. Paty*, 435 U.S. 618, 98 S.Ct. 1322, 55 L.Ed.2d 593 (1978).

lack of regard for the right of prisoners to retain some degree of protection for their religious freedom. In adopting a rule of complete deference to the conjecture of prison officials, the panel fails to apply in any substantial way the counsel of the Supreme Court that there must be an *accommodation* between the important constitutional rights of inmates and legitimate penological objectives. *Bell v. Wolfish,* 441 U.S. 520, 546, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979); *Wolff v. McDonnell,* 418 U.S. 539, 556, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974).

In order for this accommodation to occur, a prisoner's right to observe his religion should be more than merely acknowledged in passing; it should receive at least a minimal degree of meaningful protection. Yet under the test announced by the panel there is no room for such recognition or accommodation if a prison official is able to speculate that religious observance might implicate security interests. Virtually every practice in a prison has some bearing on security concerns; thus, it would be an unimaginative prison official who could not conjure up a potential security concern underlying any particular restriction. For example, officials no doubt could say that to permit inmates to gather and observe religious faiths in any fashion might create a *potential* danger to institutional security.

The standard announced by the panel, which virtually eviscerates protection for the First Amendment free-exercise rights of prisoners, would appear to overrule several prior decisions by this Court. The Third Circuit precedent setting forth the rule by which this Court is to evaluate the validity of prison regulations alleged to infringe the free-exercise of religion is *O'Malley v. Brierley,* 477 F.2d 785 (3d Cir. 1973). In *O'Malley* we held that "the state may not interpose an unreasonable barrier to the free exercise of an inmate's religion." We went on to state that "the factfinder shall find the regulation to be reasonable only if the alternative chosen ... resulted in the least possible 'regulation' of the constitutional right consistent with the maintenance of prison discipline." *Id.* at 796.

The panel seeks to distinguish *O'Malley* from St. Claire's case on the basis that the factual record in the earlier situation was more sparsely developed than the current record. At 112. The panel does not consider, however, the recent decision in *Rhodes v. Robinson,* 612 F.2d 766 (3d Cir. 1979). Although *Rhodes* dealt with First Amendment rights generally, rather than the specific right of free-exercise, it is equally applicable here, because it follows and further refines the rule of the earlier case. In *Rhodes,* Chief Judge Seitz restated the governing standard in this Circuit for evaluating restrictions on First Amendment rights of prisoners. On behalf of the Court, Chief Judge Seitz held that to be constitutionally permissible, such restrictions "must further 'an important or substantial governmental interest ... unrelated to the suppression of free expression,' and the restriction must be 'no greater than is essential to the furtherance of that interest.'" *Id.* at 770. This standard, although employing somewhat different language, is substantively the same as that of *O'Malley. Rhodes* thus constitutes the existing law of the Circuit in the area of the restrictions on prisoners' First Amendment rights. Moreover, Rhodes, announced subsequent to the recent relevant Supreme Court cases, considers and incorporates the applicable teachings of *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977); and *Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974) three of the recent Supreme Court cases dealing with constitutional rights in the prison context.

Ironically, the panel attempts to justify its disregard of *O'Malley* and *Rhodes* on the basis of these same Supreme Court cases. But neither *Bell* nor *Jones* were concerned with the scope of protection for the important rights flowing from the religion clause of the First Amendment. Thus, they should have little direct bearing on the present case. In *Bell v. Wolfish,* the Court's task was to determine whether pretrial detainees had been "punished" in dero-

gation of due process of law. The due process right at stake was somewhat nebulous, predicated primarily on a presumption of innocence. Specifically, the detainees complained of a variety of practices that diminished the comfort and privacy of their confinement. These rights, implicated in *Bell*, were not as securely rooted in the Constitution as the specific textual guarantee of free exercise of religion asserted by St. Claire. In the portion of the *Bell* opinion that did touch on First Amendment rights—where the detainees challenged a rule prohibiting the receipt of books or magazines unless mailed from the publisher or a book club—the Supreme Court stressed the availability of alternatives provided by the prison that enabled the detainees to obtain the desired reading material. Essentially, the Court regarded the "publisher-only" rule as a valid time-place-or-manner restriction. The absolute prohibition of religious headgear, which operates as a complete barrier to St. Claire's observance of an important tenet of his religion, can hardly be viewed as a time-place-or manner rule. Indeed, in *Bell* the Court reiterated that one of the constitutional rights retained by sentenced prisoners is freedom of religion, and again stressed the need for prison authorities to accommodate this right. 441 U.S. at 545–46, 99 S.Ct. at 1877–78.

*Jones*, involving a ban against solicitation and meetings by a prisoner's labor union, dealt with associational rights encompassed by the First Amendment. The right of free association, not as firmly anchored in the text of the First Amendment as the right of free exercise of religion, is perhaps the right most severely curtailed by the mere fact of confinement. Thus, the Supreme Court's reasoning that the right to associate in a labor union is at odds with prisoner status and with legitimate penological objectives may not be applied in toto to St. Claire's right to follow an essentially innocuous practice of his religious faith. There is no Supreme Court opinion of which I am aware that can be construed as suggesting that the observance of religious tenets—tenets found by the trial court to be sincerely held and harmless—is inconsistent with the status of being a prisoner.

*Pell v. Procunier*, the third Supreme Court case relied upon by the panel to deny St. Claire his First Amendment rights, concerned members of the news media who sought special access to prisons. The obvious magnitude of the security concerns triggered by the entry of outsiders into the prison for face-to-face communication with inmates motivated the Court to uphold the ban on prisoner interviews by the news media. 417 U.S. at 826, 94 S.Ct. at 2806. But St. Claire's desire to wear a Kufi and to attend a religious service does not, as the trial court specifically found, implicate any security risk. In any event, even if there were a potential security risk, it would not be of the immediate and compelling dimension of the risk that motivated the result in *Pell*. The Supreme Court also emphasized in *Pell* that there were alternative means by which prisoners could communicate their views to the public. No such alternatives exist for St. Claire.

*Bell, Jones,* or *Pell* contain no intimation that the Supreme Court intended to abandon the standard for evaluating regulations trenching severely on prisoners' First Amendment rights, announced, just weeks before *Pell*, in *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974).[2] *Martinez* counsels that such regulations must further substantial governmental interests, and must be no more restrictive than necessary to protect the interest involved. *Id.* at 413, 94 S.Ct. at 1811. This very standard, adopted by our Court in *Rhodes v. Robinson*, was followed by the district court in the case at hand.

Assuming, arguendo, that *Bell* and *Jones* do undercut *Martinez* by proclaiming a less protective standard for judging all First Amendment claims asserted by prisoners, the panel would appear to misapply the rule

---

**2.** In *Martinez* the regulations permitting widespread censorship of mail sent by or to prisoners offered no alternatives by which an inmate could express his views or beliefs. The regulation in this case has the same effect of completely foreclosing First Amendment rights.

of these recent cases. Although *Jones* and *Bell* emphasized the wide ranging deference that courts must give to the decisions of prison administrators, the cases still require regulations restricting constitutional rights to bear a "*reasonable* relationship to *legitimate* penological objectives." These opinions also declare that a regulation should not survive this reasonableness test if substantial evidence indicates that officials "exaggerated their response" to considerations such as security. Thus, *Jones* and *Bell* contemplate some judicial examination of the institutional basis for prison regulations that impinge on First Amendment rights. Under the standard of these decisions, the mere assertion by a prison official that security is implicated does not imbue the assertion with validity or the regulation with reasonableness. The trial court in its fact-finding role must still weigh the credibility of the official, and conclude whether the assertion is "arguably correct" or reasonable. 433 U.S. at 127–28, 97 S.Ct. at 2538–39.

The mere "potential danger to security" test articulated by the panel appears to dispense with the reasonableness requirement of *Jones* and *Bell*. Moreover, by concluding that the mere assertion by the officials of security concerns was sufficient to satisfy their burden, at 115–116, the panel comes dangerously close to abdicating to prison officials the judiciary's responsibility to safeguard constitutional rights. Because of their understandable concern with security, it is unrealistic to expect such officials to be particularly sensitive to the First Amendment rights of prisoners. Thus, while showing deference to the decisions of prison authorities, the judiciary should not let such deference lull it into a callousness regarding the circumscribed constitutional rights retained by prisoners.

Another disconcerting aspect of the panel opinion is the manner in which it disregards the factual findings of the trial court. Assuming, once again, that *Bell* and *Jones* set forth the governing legal standard, it would appear that when this standard is measured against the trial court's findings, the restrictions challenged by St. Claire cannot be sustained. In evaluating the prohibition against headgear in the dining hall in light of the central security objective of prison administrators, as the Supreme Court cases command, the trial judge found that the regulation had no basis in security needs at all. 481 F.Supp. 732, 739 (E.D.Pa.1979). Rather, the trial court specifically found that the rule in question was motivated by concerns of decorum. *Id.* Under *Bell* and *Jones*, the purpose to impose good manners—although desirable—is not a legitimate, *penological* objective, at least insofar as it encroaches on religious free-exercise rights. The trial court also found that the prison officials exaggerated their concerns about the security risks posed by the wearing of a Kufi. *Id.* at 739 n.13. Thus, under *Jones* and *Bell* the regulation would appear to be unreasonable.

The careful factual findings made by the trial judge appear to be amply supported in the record. He relied on testimony that hats were permitted in all other areas, including the prison yard, the farm, the gym, the commissary, and the movie room. Evidence indicates that many of these locations were at least as trouble prone as the dining hall. Indeed, the trial court pointed out that more than three times as many inmates gathered at a given time in the yard as in the dining hall. The only explanation offered by the prison officials for permitting hats in all areas but the dining hall was the blunt statement, "It's the rule." In holding that it was improper to apply the regulation to the plaintiff, the trial judge also relied on the admission by the officials that notions of decorum underlay the dining hall rule. The explanation proffered by the prison officials was that it was not polite to eat with a hat on, and that hats might become sweaty or dirty, and thus unappetizing. As for the purported security concerns, there was uncontradicted evidence that a Kufi, a form-fitting skullcap, was much too small to conceal weapons or other contraband. Moreover, the officials admitted that only a small number of prisoners would seek to wear Kufis, and that the guards could search the head coverings at

any time. In addition, some headgear that could potentially hide contraband was tolerated in the dining hall—bald prisoners could wear their wigs, and those on kitchen duty were required to wear hats much larger than Kufis. Indeed, shortly after the incident giving rise to this case, St. Claire was assigned to serve in the dining hall and compelled to wear a hat.[3]

Despite this array of substantial evidence, the panel dismissed the trial court's findings by resorting to a rather novel interpretation of the clearly erroneous rule.[4] The panel stated that if the trial judge had been apprised of the appropriate legal standard, he would have reached different factual conclusions. At 116, n.9. There is no standard of appellate review of which I am aware that permits a reviewing court to disregard factual findings by assuming that these findings were indelibly tinged by or dependent upon the legal standard applied by the trial judge. Instead, a reviewing court is supposed to discern facts from law, and evaluate each under a distinct standard of review. The law of this Circuit governing the treatment of factual findings was set forth in *Krasnov v. Dinan*, 465 F.2d 1298, 1302 (3d Cir. 1972):

> It is the responsibility of an appellate court to accept the ultimate factual determination of the fact-finder unless that determination either (1) is completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the supportive evidentiary data. Unless the reviewing court establishes the existence of either of these factors, it may not alter the facts found by the trial court.

Under this rule of review, an appellate court may not substitute its own impressions of the facts or witnesses' credibility simply because it believes the trial court might perhaps draw different conclusions from the identical record once instructed in the proper legal standard.[5] By taking this impermissible approach, however, the panel has clearly departed from binding Third Circuit precedent, and has embarked on a course of factual review that can have repercussions on the judicial process in the future.

## III.

The concern for First Amendment values expressed in this opinion is far more than academic or technical; it is rooted in a practical realization as well. In the potentially explosive prison context, I fear that the panel's lack of sensitivity to prisoner's religious rights will in the long run be counterproductive to the security interests that the panel seeks to protect. If a prisoner perceives that he is being denied so basic a right as that of observing his religious tenets, he is likely to feel degraded and upset. Such feelings may very well produce disrespect or hostility toward the authorities enforcing the denial of rights. These tendencies are illustrated by the very reaction expressed by St. Claire in this case. He testified that when ordered to remove his Kufi he felt angered and distressed because he believed his religious rights had been infringed. An angry or distressed prisoner may well become an uncooperative prisoner. In addition, a rule, such as the one advanced here, that operates against Muslims, may cause this group to feel persecuted or vengeful against prison officials. In contradistinction, permitting prisoners to observe their religion may enhance the or-

---

**3.** It cannot be said that this is a case, as in *Bell*, where the judge "simply disagreed" with prison officials. See 441 U.S. at 554, 99 S.Ct. at 1882. Here, there was a paucity of evidence that security was truly implicated, and the officials themselves testified that the rule was based on considerations of decorum.

**4.** Federal Rule of Civil Procedure 52(a) provides that findings by a trial court "shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."

**5.** Even if an appellate court properly could overturn factual findings on this basis, such an action would be unwarranted in this case. As demonstrated above, the facts found by the trial court are perfectly consistent with a legal standard derived from *Bell v. Wolfish and Jones*.

derliness of the prison. It may also further the prisons' rehabilitative goals, because religious beliefs can have a constructive impact on individuals. It may be far wiser to permit those with sincerely held religious beliefs to wear relatively innocuous objects such as Kufis in the dining hall, as well as in the yard, gym, shop, or movie room.

### IV.

For the foregoing reasons, I vote for rehearing en banc.

Chief Judge Seitz and Judges Gibbons, Higginbotham and Sloviter join in this opinion, but Chief Judge Seitz does not necessarily agree with its characterization of the standard formulated by the panel.