**Ralph A. WHEELER, Plaintiff,**

v.

**John L. SULLIVAN, Commissioner of Correction, Walter Redman, Superintendent of Delaware Correctional Center, and Raymond J. Jones, Chief of Adult Correction, Defendants.**

Civ. A. No. 82–177–WKS.

United States District Court, D. Delaware.

Nov. 21, 1984.

Anthony W. Clark, David J. Margules, Skadden, Arps, Slate, Meagher & Flom, Wilmington, Del., for plaintiff.

John J. Polk, Michael F. Foster, Rhonda Hauge, Deputy Attys. Gen., Dept. of Justice, Wilmington, Del., for defendants.

OPINION

STAPLETON, Chief Judge:

Plaintiff Ralph A. Wheeler brought this suit under the Civil Rights Act of 1871, 42 U.S.C. § 1983, against three officials of the Department of Corrections of the State of Delaware:[1] John L. Sullivan, Commissioner of the Department of Corrections, Raymond J. Jones, Chief of the Bureau of Adult Corrections, and Walter Redman, Superintendent of the Delaware Correctional Center ("DCC"). Wheeler alleges that each is liable for deprivations of his constitutional rights that occurred during his incarceration at DCC during 1980 and 1981. He also makes claims based on the Constitution and law of Delaware. This Opinion constitutes my findings of fact and conclusions of law regarding Wheeler's claims.

## I. THE FACTS

### A. Ralph Wheeler And His DCC Experience

In June of 1980, Wheeler was an eighteen year old white male. On June 6 of that year, he was sentenced to four years imprisonment on one count of burglary in the third degree. Wheeler had never before been incarcerated.

Within hours of his sentencing, Wheeler was transported to DCC. Upon arrival at about 6:00 P.M., guards locked him in a receiving room cell with ten or fifteen other inmates. Wheeler was then given a physical examination, fingerprinted, photographed, and otherwise processed. After four hours of processing, Wheeler was assigned to Vo-Tech Dormitory, one of DCC's medium security[2] units.

The Vo-Tech building was not originally designed to house inmates. Prison authorities converted it into a dormitory for up to 42 inmates in 1976 and 1977. A floor-to-ceiling wall divided the room down the middle into an A side and a B side. A bathroom and shower area were located in the back of the building. One guard was stationed at a desk on the A side near the front of the building by the door, and another was stationed at a desk on the B side near the back wall. The guard on the B side could observe most of the bathroom area, but walls obscured several spots in the shower area.

---

1. The Department was dismissed as a defendant by stipulation.

2. According to the Inmate Reference Manual, Plaintiff's Exhibit 6, an inmate is designated medium custody, maximum security or the like on the basis of the inmate's capacity to adjust to institutional life, the nature of crime committed, his institutional history, his criminal history, and the risk of his escaping. For example, medium custody is defined as follows.

> This custody designation is reserved for those residents who have demonstrated a capacity to adjust to institutional life by successfully participating in the various work, treatment, vocational, education, and recreational programs available at the Smyrna facility; but who, due to the nature of their crime, length of sentence, or past criminal or institutional histories, are inappropriate for a lower-custody status. This status will cause a resident to be eligible for all the available programs and amenities at the Smyrna facility including outside work details under the supervision of correctional staff. The resident may be assigned to either a single cell or dormitory setting in appropriately designated medium-custody units. The correctional environment

> available to the medium-custody designee may be less structured than that provided at higher custody levels.

*Id.* at 20388–89. Maximum Security custody is described as follows:

> This is the highest level of security available within the Delaware Department of Correction and is reserved for those residents requiring maximum supervision. Where possible, residents receiving this designation will be housed in single cells in appropriate units at the Delaware Correctional Center. This environment will be managed in a highly structured fashion. While assigned to the maximum security unit, movement outside the resident's cells on work assignments and during recreation will be restricted and at all times highly supervised. In general, this custody designation will be reserved for those residents who have been identified as assaultive, self-destructive, highly disruptive, or who constitute a serious escape risk. Also, residents who have "highly sophisticated" criminal histories are appropriate candidates for maximum custody status.

Upon arrival at Vo-Tech on the night of June 6th, one of the guards gave Wheeler bedding and assigned him to a bed on the B side. During the early morning hours of June 7th, he made a trip to the bathroom where he saw an inmate and a guard sharing a marijuana cigarette. The inmate said to Wheeler, "You didn't see anything here. Remember that." Wheeler agreed.

On the morning of June 7th, Wheeler met Correctional Officer Benson when Benson took over one of the Vo-Tech guard stations for the 8:00 A.M. to 4:00 P.M. shift. Benson had had three years of experience, as well as five weeks of formal training at the Department of Correction's staff training academy. Benson explained DCC's rules and regulations to Wheeler. When he noticed Wheeler's youth and nervousness, Benson tried to allay his fears. He told Wheeler he would try to get him a bed close to the guard desk so the guard on duty could watch him. Benson also told Wheeler to come to him if he had any problems. The only request Wheeler made of Benson that day was that he get him a blue uniform like those worn by men assigned to general population. Benson gave Wheeler one set of "blues" and promised to get him a second set when he could.

Wheeler was also approached some time that morning by an inmate named Raymond Clayton. Clayton sat down on Wheeler's bunk and asked Wheeler how old he was, the length of his sentence, and whether he had ever been incarcerated before. Clayton told Wheeler that violence and danger pervaded prison life, and that Wheeler himself was in immediate jeopardy. He offered to protect Wheeler in exchange for commissary items. Wheeler readily agreed, hoping that such an arrangement might ensure his safety. Clayton then told Wheeler that Wheeler would also have to provide him with sexual favors. When Wheeler balked, Clayton said he had only been testing Wheeler. Clayton told Wheeler to meet him after lunch to make a list of commissary items Clayton wanted.

When Wheeler met Clayton after lunch, Clayton listed a number of items he wanted Wheeler to get him from the commissary. In addition, Clayton again demanded homosexual favors. Clayton told Wheeler that if he did not comply he would be assaulted, raped, and murdered by Clayton and other inmates. He told Wheeler to meet him in the Vo-Tech shower at one o'clock. A terrified Wheeler agreed.

Just after 1:00 P.M. on June 7th, after most of the residents had left Vo-Tech for the yard area, Clayton walked past Wheeler's bunk and into the shower room. Wheeler followed as ordered. A third inmate, a large muscular man, stood where he could see both guard desks. Wheeler undressed and went into the shower area. Clayton then sodomized Wheeler in one of the corners of the shower which was hidden by a wall.

Wheeler also met and took a walk with one Van Arsdale. Through Van Arsdale, he met some inmates on the compound during the day. Several of these inmates testified that Wheeler asked them at some point whether one could get out of prison by claiming to have been raped.[3] All of them told him no.

Wheeler called his parents later that day and told them everything was fine. He did not tell them of his encounter with Clayton.

Wheeler saw Clayton again on June 8th at about 2:00 P.M. Clayton asked Wheeler about the items Wheeler had promised to get for him from the commissary. Wheeler told Clayton he no longer intended to get Clayton anything. Clayton became angry and threatened to beat Wheeler, but the intercession of a friend of Van Arsdale enabled Wheeler to get away.

An hour or two later, another inmate—a large muscular man Wheeler had never seen before—threatened Wheeler. He told Wheeler that Wheeler was his piece of

---

**3.** Inmate Dawson testified that Wheeler asked him the same question on the morning of June 7. Inmate Van Arsdale said Wheeler asked him this question on the afternoon of June 7, and Inmate Phelps said Wheeler asked him the same question on June 8.

property and that he would have to do whatever the inmate wanted, including having sex with anyone the inmate chose. He told Wheeler that Wheeler could either follow his orders or be killed.

Wheeler sought out the prison chaplain. When he found the chapel locked, he called his parents. He told his father he had been raped. His father told him to report the incident to the guards and Wheeler did so. His father contacted defendant Sullivan who told him that the younger Wheeler would be protected and the incident investigated.

When Wheeler reported the assault to a correctional officer, he lied; he told the officer that Clayton had forcibly raped him at knifepoint. He also told the officer of the most recent threats by the other inmate. The officer took Wheeler to the prison hospital, where he was examined by Nurse Velma Persinger. Persinger noted a small, fresh tear in the lining of Wheeler's rectum. Wheeler remained at the hospital for several hours.

At 8:00 or 9:00 P.M., Officer Richard Quashne of the Delaware State Police, Captain Thomas Redden and Security Chief George Pippin of DCC questioned Wheeler. The three men found the story Wheeler related to them incredible—that Clayton had come up behind him in the shower with a knife, held the knife to his throat, held him down, and raped him. Wheeler signed Officer Quashne's report, which recorded the events as related by Wheeler. After further questioning, Wheeler was returned to the hospital and placed in a protective custody status.

Quashne, Redden and Pippin then interviewed Clayton, who denied any involvement in or knowledge of the incident. Favors, Clayton's homosexual partner, offered an alibi for Clayton. Van Arsdale and other inmates reported that Wheeler had asked them if an inmate who reported having been raped would be released or transferred.

Between 1:00 and 2:00 A.M., Wheeler was awakened and questioned again. He eventually admitted to having lied about the knife. Wheeler maintained, however, in spite of harsh questioning, that he had indeed been raped. When someone mentioned a polygraph test, Wheeler volunteered to take one. Wheeler was then returned to the infirmary for the remainder of the night.

Redden, Pippin, and State Police Officer Timothy Hadley questioned Wheeler again at 10:00 A.M. on June 9th. Wheeler produced a written statement consistent with his second story (i.e., he had been raped but no knife had been involved), and reiterated this story to Hadley.

Wheeler went for a polygraph test on June 16, 1980. Prior to the start of the test, the detective who was to conduct it interviewed Wheeler. According to Wheeler, the detective warned him that if he were nervous, the test might produce false results. Wheeler then declined to go forward with the test because he was nervous and uncomfortable about having lied during the original interrogation. The detective understood Wheeler to acknowledge in the course of the pre-test interview that Clayton had not used force. However, while something about an absence of force was said, Wheeler did not intend to indicate that he had submitted voluntarily.

Wheeler spent the next few months at DCC—from the report of the rape in June to November of 1980—on protective custody. Protective custody secured him from further assaults and threats, but his opportunities for recreation, participation in educational programs, and earning good time credits were severely restricted. During these months, Wheeler was housed in numerous areas of DCC under what he claims were unbearable conditions.

From June 8, 1980 to September 16, 1980, Wheeler lived in the DCC infirmary, first in a cell with one other inmate and then in a larger ward room. According to Wheeler, the cell was small, infested with vermin and smelled of rotting food, and the ward room was filthy, smelled of human excrement, and was virtually unventilated. He further testified that the mattresses

and bedding were also dirty and that he received clean clothes only once every four or five days.

From September 17, 1980 to November 6, 1980, Wheeler was housed in a single cell in Maximum Security A block. According to Wheeler, his mattress and bedding were filthy, the other inmates in the area smelled badly, and the noise level remained high almost constantly.

From November 7, 1980 until October 29, 1981, Wheeler was housed at the Kent Correctional Institution and then released from incarceration under the supervised custody program. On October 30, 1981, he was returned to DCC, and requested protective custody status. From October 30 through November 1, Wheeler was housed by day in a cell in the receiving room with between eight and twenty-four other inmates. The mattresses and bedding in the cell were dirty and the broken toilet caused the cell to smell of excrement. By night, Wheeler and thirty other inmates were locked into what was called the television room. It was a large room without toilets or showers. Inmates who needed to go to the toilet at night had to bang on the door loudly to summon a guard to escort them to toilets located elsewhere. The floor of the room was covered with mattresses and bedding on which inmates slept. In both the cell and the television room, the noise levels were high and both were oppressively hot.

On November 2, 1981, after Wheeler reported to the guards that he had been threatened by a group of inmates, he was put on protective custody status and transferred to the prison infirmary where he stayed until December 21, 1981. During the first three days, from November 2 until November 5, 1981, Wheeler was confined by himself in a cell in the infirmary known as the Ram Room. The Ram Room had only a hole in the floor for a toilet. Wheeler was given no hearing prior to his transfer to the Ram Room.

On December 21, 1981, Wheeler was transferred from the infirmary to Maximum Security B Block area. According to Wheeler, conditions were much the same in this area as they had been during his previous assignment to Maximum Security A Block, with the additional fact that the area was now cold due to some broken windows. On the night of December 22, 1983, Wheeler twice attempted to injure himself in an effort to get assigned to a different area of DCC. After the second attempt, Wheeler was treated at the hospital and was then placed in an isolation cell without light, mattress, or clothes until the morning of December 23. He received no hearing prior to his confinement in the isolation cell.

On December 23, Wheeler was returned to his cell in the Maximum area, where he remained until February 26, 1982. On that date he was transferred to the Kent Correctional Institution for the remainder of his sentence. In total, Wheeler spent approximately nine months at DCC.

### B. Raymond Clayton

In June of 1980, Raymond Clayton was a twenty-three year old black male serving a two to twenty year sentence for first degree robbery. He had been incarcerated since 1976. During most of this period he had been classified to minimum and medium security although he had had several short stays in the Maximum Security Section.

In the Spring of 1978, Clayton was transferred from Minimum to Maximum Security on a Rule 31 (i.e., emergency) basis based on complaints of other inmates that he had forced them to give up commissary and other items through "strong arm tactics and threats of bodily harm and sexual threats." (PX–33).

During the two years preceding April 9, 1980, Clayton had had no disciplinary charges brought against him. On April 9, 1980, he was accused of attacking an inmate named Favors with whom Clayton had been having a homosexual relationship. Clayton was transferred from Medium to Maximum Security pending an investigation. The report of the investigation notes that Clayton was a homosexual and that Favors had been homosexually involved

with him. It further stated that Favors did not wish to press charges. On April 17, 1980, Clayton was given a hearing on whether the emergency situation which had occasioned his transfer had terminated. A decision was made by Capt. Thomas Redden that Clayton could be transferred to the Vo-Tech building in Medium Security as soon as space was available. The Favors incident was referred to the Major Adjustment Board, the institution's discipline board, but the record does not indicate the Board's disposition of the charges.

On June 6, 1980, the day before he allegedly raped Wheeler, Clayton was attacked while sleeping in his bed in the Vo-Tech building by an inmate named McGinnis. McGinnis struck Clayton with a mop wringer. During the ensuing investigation on June 6th, McGinnis admitted the assault to Captain Redden. He charged that Clayton had been harassing him for homosexual favors for some time, and that when McGinnis refused to submit to Clayton's pressure, Clayton would strike him. McGinnis claimed he had assaulted Clayton to discourage him from these activities. This incident was investigated on the day it occurred by Captain Redden and Security Superintendent Pippin, although a report was not written until several days later.

### C. The Governor's Task Force

On June 12, 1979, Governor duPont directed the Delaware State Police, the Department of Corrections, and the Attorney General's Office to form a joint investigative task force for the purpose of investigating a series of escapes from correctional facilities in the State of Delaware. The Governor's Investigative Task Force began its work and, following a preliminary inquiry, concluded that the problems which had contributed to these escapes were more extensive and complex than had first been thought. The Task Force uncovered evidence of guard complicity in the escapes, extensive drug traffic in the prisons, and inadequate security practices and procedures. After further discussions with the Governor, it was agreed that the scope of the inquiry should be expanded and become a comprehensive investigation designed to identify facts contributing to security problems with the goal of developing recommendations for consideration by the Governor.

After further inquiry, including a covert investigation, the Task Force submitted an Interim Report on October 9, 1979. This Report made twenty-one "Findings" and "Recommendations" in the areas of "security, personnel, training and operations." Among the myriad of problems discussed were the following:

*Finding #2:* Overcrowding colors everything the Department of Corrections does and has degraded efforts to improve a problem-ridden system.

*Finding #10:* Homosexual rapes are frequent, and there is apparently no effective internal process to investigating such occurrences. Additionally, many guards demonstrate a lack of appreciation of the serious nature of this criminal act, and in some instances, correctional officers have become callous and accept the act as part of the prison environment.

*Finding #11:* Present correctional staff require professionalization in several areas including, but not limited to, recruitment, compensation, retention etc. It is fair to say that although the complicity and complacency of the correctional officers' staff is possibly the largest sole contributor to the present security lapses in the prison system, and it is equally true that the system's failure to provide management with sufficient tools to effectively deal with personnel problems in this area is also a contributor to the security problem. Many correctional officers are found to have conviction records.

*Finding #13:* The instance of correctional officers being placed on duty without any training is a regular occurrence in the correctional system. Inmates perceive this weakness and have become expert at "conning" the new officer. Inmates attempt to compromise the officer by requesting "little favors" for the in-

mate and often times the officer perceives it as a way to ingratiate himself to inmates. It appears this occurs not from desire of the officer to be conned but rather out of ignorance and a lack of proper training in dealing with the psychology of inmates. It is fair to say that the manipulation of correctional officers by inmates contributes largely to the introduction of contraband into the institutions.

The Final Report of the Task Force was submitted in October of 1980. The Report made reference to a substantial number of changes that had been made in the preceding year but noted "that in excess of fifty percent (50%) of the initial recommendations made by the Task Force in October 1979 [had] ... not been fully implemented." While acknowledging that "the total eradication of problems from a prison system is impossible," the Task Force reported that something further needed to be accomplished in four primary areas: "Overcrowding," "Contraband," "Homosexual Rapes and Assaults," and "Personnel." Of the first and third, the Report observed:

> 1) OVERCROWDING—Prison management is still hampered on a day-to-day basis with the problem of controlling prison population, and nothing has changed with respect to those problems that overcrowding causes effective management. The overcrowding continues to color and is directly related to other problem areas including security, humane treatment of inmates, lack of significant rehabilitative efforts by the Department and the revolving door syndrome of Delaware prisons.

> \*    \*    \*    \*    \*    \*

> 3) HOMOSEXUAL RAPES AND ASSAULTS—The Delaware Correctional System has adopted regulations and standards of responsibility with respect to homosexual attacks. Likewise, a new procedure for reporting instances of this sort to the State Police has been announced.

> In spite of these steps, various State Police troops as well as the Attorney General's Office continue to receive complaints of occurrences of these types of crimes within institutions....

> The efforts taken by the Department of Correction to contain this problem will have no significant impact on the incidence of this intolerable crime until there is some means or ability to effectively segregate and protect the likely victims of this type of assault.

### D. Commissioner Sullivan

John Sullivan became Commissioner of the Delaware Department of Corrections on October 11, 1979, two days after the issuance of the Interim Report. He had had no prior relevant contact with the Department. Since October of 1979, he has had primary responsibility for establishing the policies and plans of the Department. Sullivan toured DCC several weeks after his appointment and since that time has been familiar with conditions at DCC in general and in the receiving area in particular.

On October 26, 1979, Sullivan established a Task Force to address the problems identified in the Interim Report. A Task Team was assigned to study and recommend remedial action in each of the twenty-seven problem areas. The Task Team assigned to address the homosexual rape problem recognized that the presence of homosexuals and youthful offenders in the general population was a factor contributing to the problem but the administration of the Department concluded that it did not have the resources necessary to effect the necessary segregation.

On April 1, 1980, a Training Academy was established for the Department staff. Included in the six week, forty hour per week course given to correctional officers was instruction on homosexual rape prevention. On June 23, 1980, Sullivan issued a formal regulation on the subject of homosexuality which, among other things, directed the Staff Training Office and the prison psychologist to "provide special training for supervisory level staff in the

management of inmates who exhibit homosexual tendencies and behavior."

The study of the overcrowding problem during the winter of 1979–1980 resulted in a recommendation that a "supervised custody" program be established to ease the problem pending completion of two additional adult male prisons then under construction.[4] This program, which was instituted on February 12, 1980, provided for the release of selected inmates prior to sentence completion. As of January 1, 1980, the total system inmate population was 1,301 and was growing. By June 30, 1981, 190 inmates had been on supervised custody and the total number of incarcerated inmates had dropped slightly to 1,265.

As of June 30, 1981, Sullivan believed that the new construction already underway, along with supervised custody, would meet the projected needs of the Department until 1989. Unfortunately, the growth in the inmate population increased at a rate of 33 new inmates per month in late 1981 and continued at about that level until February of 1983. In an effort to deal with this problem, Sullivan, in March of 1982, ordered that a wall be moved in C Tier and that the tier be double bunked. This resulted in the capacity of the Receiving Area going from 12 to 74 beds. In addition, the Vo-Tech Dorm was reopened as an option to carry overflow. From July 1981 to July 1982, 287 new bed spaces were added in existing Department facilities.

The first time that Sullivan heard of Wheeler was when Wheeler's father called him on June 8, 1980. He did not personally participate in the investigation of the June 7th rape and did not have personal knowledge of any of Wheeler's subsequent transfers during his stay at DCC.

### E. Bureau Chief Jones

Raymond Jones was appointed Chief of the Bureau of Adult Corrections on July 16, 1981. For a short period prior to that time, he was employed by the Department of Corrections as Executive Assistant to the Bureau Chief.[5] As Bureau Chief, he supervises the Wardens and directors of the Bureau of Adult Correction, "administratively, budgetarily and operationally." In the course of performing these responsibilities, he periodically tours the institutions run by the Bureau. Chief Jones reports to Commissioner Sullivan.

Chief Jones toured DCC in the summer of 1981 and has been generally familiar with conditions there since that time. The primary concern during that summer was overcrowding, particularly in the Receiving Room. The only decision Jones personally made with respect to Wheeler was the decision to approve the recommendation that he be placed on supervised custody. He was not advised of any broken windows in Maximum Security in 1981 and, while he reviews inmate grievances as part of his job, he recalls receiving none about physical conditions, clothes, or bedding in the DCC hospital.

### F. Warden Redman

Walter Redman has served as Warden of DCC since April 1, 1976. He is responsible for enforcing departmental policies and institutional rules at DCC. Through supervision captains, he oversees a staff of approximately 300 people, consisting of custody staff, treatment staff, educational staff, maintenance staff, and food service staff. The initial review of investigations, emergency transfers and other disciplinary matters were delegated to Captain George Pippin. The health care staff in the hospital was provided by a contract health care provider and Redman did not supervise this staff except to see that they complied with the security rules of the institution.

While Redman did not make initial disciplinary and classification decisions, he reviewed and could approve or disapprove such decisions. He could not, however, increase penalties imposed by the Adjust-

---

**4.** As of January 1980, two new institutions were under construction—Gander Hill with 360 beds and the Symrna Maximum Security Unit with 64 beds.

**5.** The record does not reveal the date when Jones was first hired by the Department but it was sometime in 1981.

ment Board. Warden Redman had no knowledge of Wheeler until June 8, 1980 when he was notified of Wheeler's claim that he had been raped by Clayton. Thereafter, he did not participate personally in the investigation, although he reviewed the report of it.

Redman was orally advised of McGinnis' attack on Clayton on June 6, 1980, although he did not receive a written report until June 10th or 11th. In June of 1980, the average daily inmate population at DCC was 897.

Redman had knowledge of the general conditions at DCC during Wheeler's stay there.

## II. THE COMPLAINT

Wheeler's amended complaint asserts several violations of his rights under the Eighth and Fourteenth Amendments. First, Wheeler asserts that the defendants instituted policies at DCC that resulted in his being assaulted and sodomized by Clayton on June 7, 1980. Second, Wheeler says that the defendants' policies led to harsh conditions, including overcrowding and unsanitary, unhealthy conditions, lack of proper heat and ventilation, and inadequate opportunities for educational, recreational, and rehabilitative activities. Third, Wheeler contends that he was transferred for several days into the Ram Room in November of 1981, and to an isolation cell in December of 1981 without a hearing or any other type of procedural protection. Finally, Wheeler advances claims based on state law. Wheeler says he has suffered substantial injuries as a result, and asks that he be awarded compensatory and punitive damages.

## III. THE ASSAULT CLAIM

Wheeler claims that Clayton, through threats of violence, coerced him into submitting to sodomy. The defendants contend that Wheeler fabricated the incident out of whole cloth, or, in the alternative, that he consented as part of a deal for protection. As earlier indicated, I find it more likely than not that Clayton did in-

deed rape Wheeler. This fact, however, does not answer the critical legal question: Are these defendants liable for the assault?

In *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), the Supreme Court of the United States held "that deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' ... proscribed by the Eighth Amendment." 429 U.S. at 104, 97 S.Ct. at 291. It reached this conclusion through the following analysis:

An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. In the worst cases, such a failure may actually produce physical "torture or a lingering death," *In re Kemmler, supra* [136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519], the evils of most immediate concern to the drafters of the Amendment. In less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose. *Cf. Gregg v. Georgia, supra,* [428 U.S. 153], at 182–183 [96 S.Ct. 2909, at 2929–2930, 49 L.Ed.2d 859] (joint opinion). The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency as manifested in modern legislation codifying the common-law view that "it is but just that the public be required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself."

We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain." *Gregg v. Georgia, supra,* at 173 [96 S.Ct. at 2925] (joint opinion), proscribed by the Eighth Amendment....

This conclusion does not mean, however, that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment. An accident, although it may produce added anguish, is not on that basis alone to be characterized as

wanton infliction of unnecessary pain....

429 U.S. at 103–106, 97 S.Ct. at 290–292.

■ Personal security, like medical care, is one of life's necessities to which inmates are entitled in "minimal civilized measure." *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981). If the need for personal security is not met by prison authorities, it will not be met. If there is a failure to meet that need, pain and suffering may result which no one suggests would serve any penological purpose. At the same time, a negligent failure to provide personal security, like a negligent failure to provide medical care, "cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 're-pugnant to the conscience of mankind.'"

**6.** *See also Patzig v. O'Neil,* 577 F.2d 841, 847–48 (3d Cir.1978):

> In order to establish a constitutional violation under the eighth amendment, it is necessary that there be a deliberate indifference to the prisoner's needs. *See Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Hampton v. Holmesburg Prison Officials, supra* [546 F.2d 1077] at 1081 [3d Cir. 1976]. A reading of the evidence before the district court reveals that police personnel may have acted negligently, perhaps even callously; but such actions do not amount to the "intentional conduct characterizing a constitutional infringement." *Id.* at 1078. "More is needed than a naked averment that a tort was committed under color of state law...." *Gittlemacker v. Prasse,* 428 F.2d 1, 6 (3d Cir.1970). On the record before us, we find that no such intentional conduct was shown. Consequently, the district court did not err in entering a directed verdict in defendants' favor with respect to the "cruel and unusual punishment" claim. *Denneny v. Siegel* [407 F.2d 433 (3d Cir.1969) ] *supra.*

The same result is reached under a due process analysis under the Fourteenth Amendment. Some courts have refused to treat as punishment conduct that is not ostensibly intended to serve some legitimate penal objective, but have nonetheless found a proscription of wanton and unnecessary infliction of pain under a due process theory. *See Rhodes v. Robinson,* 612 F.2d 766, 771–72 (3d Cir.1979); *Curtis v. Everette,* 489 F.2d 516 (3d Cir.1973); *Johnson v. Glick,* 481 F.2d 1028 (2d Cir.1973), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973). The test under this theory is whether the conduct "shocks the conscience." *Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952); *Rhodes v. Robinson, supra.* The crucial

■ For these reasons, I conclude that Wheeler is entitled to recover if he has shown that one or more of the defendants were deliberately indifferent to a substantial risk that he would incur serious personal injury.[6] He cannot recover, however, if he has failed to establish this degree of culpability on the part of any of the defendants.[7]

■ The second relevant legal principle is that one may not be held vicariously liable under Section 1983 for the misconduct of another. *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); *Hampton v. Holmesburg Prison Officials,* 546 F.2d 1077 (3d Cir.1976); *King v. Cuyler,* 541 F.Supp. 1230 (E.D.Pa.1982). Thus, the relevant question is not whether subor-

question is the manner of infliction of the injury; an improper state of mind by those causing the injury is required. *Rhodes v. Robinson, supra; Holmes v. Goldin,* 615 F.2d 83, 85 (2d Cir.1980).

**7.** *But see Withers v. Levine,* 615 F.2d 158, 162 (4th Cir.1980):

> ... [N]egligence by a state official under some circumstances may itself violate a constitutionally protected right; when it does, it is actionable under § 1983. *McCray v. Maryland,* 456 F.2d 1, 5 (4th Cir.1972).
>
> When there is present in a prison or in an identifiable portion of it, a pervasive risk of harm to all prisoners, or to an identifiable group of them, the constitutional prohibition against cruel and unusual punishment requires that prison officials exercise reasonable care to provide reasonable protection from such unreasonable risk of harm. Given the pervasive and unreasonable risk of harm, negligence by prison officials in their performance of their duty of care is a violation of the constitutional right and actionable under § 1983. The constitutional rights would often remain unredressed if a higher standard of care were required.

There will be few if any cases, however, in which this standard will produce a different result from a standard based on *Estelle v. Gamble.* Application of the *Withers* standard would not produce a different result in this case because no "pervasive risk of harm" existed in Vo-Tech in June of 1980, and because I cannot say that Wheeler was injured by the failure of any defendant to exercise that degree of care which would have been exercised by a reasonably prudent prison official in the same circumstances.

dinates of these defendants were deliberately indifferent to a substantial risk of serious injury to the plaintiff, but whether any of the defendants exhibited such indifference.

■ Finally, plaintiff must show a causal connection between a defendant's deliberate indifference and the injury for which compensation is sought. *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981); *McKenna v. County of Nassau*, 538 F.Supp. 737, (E.D.N.Y.1982) *aff'd* 714 F.2d 115 (2d Cir.1982); *Redmond v. Baxley*, 475 F.Supp. 1111 (E.D.Mich. 1979). Thus, even if Wheeler can show some deficiency in a defendant's performance rising to the level of deliberate indifference, that deficiency must be one of the proximate causes of the June 7th assault.

Wheeler does not charge that defendant Sullivan[8] had advance knowledge of the specific risk which Clayton posed for Wheeler on June 7, 1980. His claim is that policies and management deficiencies which were known to Sullivan created a high risk of homosexual rape in the Vo-Tech Dormitory and that Sullivan conducted himself with deliberate indifference to that risk. Wheeler points to four areas in which he maintains correctional policies, management deficiencies and Sullivan's failure to alter the same were proximate causes of the homosexual rape: inadequate training of guards, inadequate orientation of new inmates, irresponsible assignment practices with respect to the Vo-Tech Dorm and "extra-ordinarily reckless" practices with respect to the reporting, investigation and prosecution of homosexual rapes.

Wheeler makes the same charges against defendant Redman. In addition, however, he alleges that Redman did have some knowledge of the specific threat represented by Clayton on June 7th. While Wheeler acknowledges that Redman was not the one who decided whether Clayton would be transferred to maximum security following the Favors and McGinnis incidents, he charges that Redman's failure to intervene

and direct Clayton's placement maximum security was a proximate cause of the rape. I will address this issue before turning to each of the four areas in which the policies and practices of the institution and/or the Department are challenged.

■ Following the Favors-Clayton incident, a reasonable classifier of inmates could clearly have concluded that Clayton remained suitable for medium security. While he was known to be a homosexual and had a reputation among some of the staff as a bully, Clayton had had no disciplinary violations in over two years and was engaged in a long term consensual relationship with Favors. Moreover, even if one assumes a classification officer or team should have perceived greater risk than Captain Redden perceived when he approved Clayton's return to medium security after the incident, this still would not mean that Warden Redman was remiss in failing to intervene and reverse the decision of a responsible officer much closer to the inmate and the circumstances involved than he. In any event, however, Warden Redman's failure to intervene and reverse Redden's decision clearly does not evidence deliberate indifference to the personal safety of the inmates in medium security.

It is true that additional information became available to Captain Redden and Warden Redman on Friday, June 6, 1980, following McGinnis' assault on Clayton. While we do not know how detailed that information was, Redman was on duty that day and he is confident that Captain Redden would have notified him orally of this incident. Moreover, Redman must have gotten involved to some degree because one of the guards at the scene of the incident "froze" and, as a result, was suspended that day pending an investigation of his conduct. The failure to have Clayton transferred to maximum security prior to 1:00 P.M. the next day, however, does not show deliberate indifference to a substantial risk of serious injury. Clayton was the

---

**8.** Defendant Jones was not employed by the Department of Corrections on June 7, 1980 and, accordingly, is not a defendant with respect to the assault claim.

victim of the June 6th incident and that incident itself did not provide a basis for transferring him to maximum security. At best, it yielded information, tendered by the wrongdoer by way of mitigation, which reasonably could provide a basis for further investigation of the alleged prior incidence of harassment by Clayton. Accordingly, I do not fault Redden for failing to transfer Clayton on an emergency basis. Even if I were disposed to do so, however, Redman's failure to reverse Redden's judgment call would not suggest to me deliberate indifference on Redman's part.

### A. Inadequate Training Of Guards

Wheeler alleges that defendants' policies put his safety in the hands of inadequately trained guards at DCC. He contends that the guards lacked the training and preparation necessary to effectively provide inmates with reasonable protection from harm at the hands of their fellow inmates. In light of the reports presented to defendants by the Governor's Task Force indicating that homosexual rape was a frequent occurrence at DCC, Wheeler asserts that this "reckless" policy evidences the defendants' deliberate indifference and that his injury inevitably followed from that policy.

I do not understand the defendants to contend that the guard corp at DCC was adequately trained in June of 1980. The staff Training Academy had begun operating only weeks before Wheeler's incarceration and, as of that time, only a handful of DCC's guards had taken the six weeks of training which the academy offered. It is thus more likely than not that the guards Wheeler encountered when he arrived at DCC had not received the benefit of the Academy's instruction. Moreover, since the training before the establishment of the Academy was limited, it is likely that the guards in the Vo-Tech building in June of 1980 were not well trained and had acquired most of the whatever knowledge or skill they had through practical experience. We do know, however, that Officer

Benson had had some instruction over a five week period back in the summer of 1977 and that he had had three years of practical experience on the job.

■ This does not mean, however, that inadequate training of staff caused Wheeler's assault. This was not a case in which a guard was confronted with a situation he was ill equipped to handle and someone was injured as a result. The guards in Vo-Tech were never put to the test because they were never informed of Clayton's threats or asked by Wheeler for protection.[9]

Nor is this a case in which inadequate guard training played a material role in the failure of an inmate to seek help. First, Wheeler simply had not been at DCC long enough to form any opinion with respect to the capabilities of the guards and the limited contact he had had with them provided no basis for a negative conclusion on that issue. By the time of the assault, Wheeler had encountered the guards on the bus to DCC, those in the receiving room, those at the control center at DCC, and those at Vo-Tech, including Officer Benson. Those on the bus did not speak to him. Those in the receiving room processed Wheeler without incident. The guards at the control center told him how to find Vo-Tech, and the guard he met there gave him bed clothes and a bed. In other words, the guards Wheeler had dealt with up through his arrival at Vo-Tech assisted and processed him efficiently. In Vo-Tech, Officer Benson took notice of Wheeler and attempted to reassure him. He explained the rules and regulations and told Wheeler that if he had any problems he should come to him. The guards had thus given Wheeler no reason to conclude that they could not be trusted to help him if his safety were jeopardized.

Wheeler did not report Clayton's threats or ask for protective custody because he feared the reaction of the other inmates if he became a "snitch," because he knew

---

9. Wheeler does not contend that adequately trained guards would have spotted Clayton and Wheeler in the shower. His theory at trial, which was not pressed in the briefing, was that negligent shower design precluded the guards from seeing the relevant area of the shower.

that protective custody involved greatly restricted daily life, and because he had a basic distrust of authority. While the decision on whether to seek help was undoubtedly a difficult one and one can empathize with Wheeler in having to make it, the factors which made it difficult are facts of prison life and cannot be laid at the feet of these defendants.

I am mindful of Wheeler's testimony that his observation of a guard smoking a marijuana cigarette played a role in his decision not to seek help, but I am confident that his decision not to report Clayton would have been the same even if he had not observed that episode. Moreover, it was not inadequate guard training which led to this incident. Officer Roach simply should not have been a corrections officer and when his misconduct was brought to the attention of the administration, he was fired.[10]

Finally, Wheeler has not shown that either Redman or Sullivan were indifferent to the problems of guard training. It does not appear that it was within Redman's sphere of responsibility to initiate and develop a training program for corrections employees. While these tasks were clearly within Commissioner Sullivan's jurisdiction, his establishment of the Training Academy shortly after assuming command speaks of his concern, not of indifference.

### B. Inadequate Orientation Of New Inmates

Wheeler contends that the defendants' policies caused him to be thrust directly into the general prison population without providing him with any orientation to prison life in general and to DCC in particular. In light of the fact that the defendants knew that prison life involved a significant risk of homosexual rape, especially in the

case of an inmate with Wheeler's personal characteristics,[11] Wheeler argues that these policies show a deliberate indifference to a substantial risk of serious injury.

In June of 1980, the orientation of new inmates was an informal process which was left to the guards, like Officer Benson, in the housing units. Clearly a less haphazard, more thorough, and more helpful system of orientation could have been devised and would have been better corrections practice. Once again, however, I do not believe the identified deficiencies were a proximate cause of any injury to Wheeler.

Wheeler entered the prison at 6:00 P.M. on Friday afternoon; he was raped at 1:00 P.M. on Saturday. In the short interval between these events, he was told by Officer Benson what to do if he were confronted with a problem. Even if he had not received this orientation, however, he knew on June 7th that the guards were there, in part, for his protection and that protective custody was available for the asking. As just noted, he was subjected to injury not because he lacked information that a better orientation program would have provided, but rather because he was distrustful of authority and because he believed that seeking help from a guard or asking for protective custody would have adverse consequences he was unwilling to accept.[12]

### C. Housing Assignments

Wheeler contends that no one who had any sensitivity to the risk of homosexual rape could countenance a housing assignment system which mixed new, young, inexperienced inmates, like Wheeler, with aggressive homosexual inmates, like Clayton, in a dormitory setting, like Vo-Tech.

Ideally, those most likely to be assaulted and those most likely to assault should be

---

**10.** Officer Roach was also indicted.

**11.** The testimony showed that young, white slightly built inmates with no prior incarceration experience are more likely than other members of the general population to be homosexual rape victims. While Wheeler is of medium stature, he had the other characteristics of this group.

**12.** While I am aware that one of the objectives of a good orientation program is to build trust between inmates and staff, I do not believe any such program could have materially altered Wheeler's distrust of authority in half a day.

segregated from each other in a prison. This principle and the preservation of security underlie the protective custody, classification, and disciplinary systems which existed at DCC in June of 1980. Those systems were not effective in preventing injury to Wheeler. This does not mean that his Eighth Amendment rights were violated, however.

■ There are a number of factors which limited the effectiveness of these systems at DCC. The first is an inherent limitation on any such assignment systems, our limited capacity for predicting the likelihood of future violence by a specific individual. While Wheeler argues that anyone should have recognized Clayton as a time bomb about to go off, I believe, as earlier indicated, that this conclusion is not as obvious as he suggests. Moreover, the judgments that have to be made are relative ones. For reasons discussed hereafter, the issue is usually not whether a specific individual is likely to act out but rather whether he is more likely to act out than others who might occupy that bed in maximum security.

A second factor which limited the effectiveness of the assignment systems at DCC, as defendant's expert Dr. Ault noted, was the "open campus" design of the institution. Because of that design, the ability of the institution to segregate those most likely to be attacked, other than in protective custody maximum security, was limited. Assignment to protective custody in maximum security was not a satisfactory answer because it necessarily involved very restrictive custody which could not fairly be imposed on inmates who did not request it.

Finally, the factor which played by far the greatest role in limiting the effectiveness of the assignment systems was overcrowding. In the summer of 1980, DCC's inmate population was in excess of its design capacity. In such situations, even if one accurately assesses the capacity of a certain inmate for violence, it does no good until sufficient bed space is available in the appropriate unit so that an appropriate as-

signment can be made. The point is persuasively made in the following colloquy between plaintiff's counsel and Dr. Ault:

Q  I see. You are distinguishing between actually doing something on the basis of the classification you have done and performing the classification assessment; is that right?

A  That's correct.

Q  So you can classify those people perfectly?

A  That's right.

Q  Even if you don't have any place to put them once you have got that classification?

\*      \*      \*      \*      \*      \*

Q  But if you have got an institution where you filled over 95 percent of the capacity of that institution with inmates, can you reasonably expect to achieve the main goal, or one of the main goals of the classification function, that is, seeing to it that appropriate types of inmates are segregated from each other. Can you hope to achieve that?

A  As you begin to become overcrowded, depending on the design of the institution, that becomes difficult.

Q  Well, let's talk about DCC. That's the institution we are worried about here.

A  Okay.

Q  You think they could adequately segregate the right kind of people from the wrong kind of people at DCC when they were constantly running at well in excess of 95 percent of the design capacity?

A  It would be extremely difficult.

Q  It would be almost impossible, wouldn't it? Let's be fair.

A  It would be extremely difficult. I don't know if impossible, but it would be extremely difficult.

The record in this case does not support the contention that Sullivan and Redman were deliberately indifferent to the desirability of separating potential predators from potential prey or to the risk of not doing so. Not only does the evidence indicate that they had classification, protective

custody, and disciplinary systems in place, but it also indicates that the administration and staff were attempting to make those systems work despite difficult circumstances. These were not simply paper systems; the intake staff was instructed to look for potential victims of homosexual assault and to offer them protective custody, inmates were classified and reclassified, those requesting protective custody were normally given it, and disciplinary proceedings did take place which resulted in predators being temporarily isolated. When housing assignments were made which, because of overcrowding, were inconsistent with the classification system, they were considered temporary assignments which were to be changed when conditions permitted.

When Wheeler was admitted to DCC on the night of June 6, 1980, he was assigned to the Vo-Tech Dorm in medium security, on a temporary basis. While this turned out in retrospect to be an unfortunate choice, Wheeler has tendered no evidence to suggest that a bed was available for him in any other section of the prison to which he could have been assigned and in which there would have been a lesser risk of assault. Indeed, Wheeler has not shown that there was a safer place he could have been assigned, absent a request from him for protective custody, even if he had been given priority over previously assigned inmates. As the defendants' corrections expert Dr. Ault explained, the ratio of one guard to twenty-two inmates in the Vo-Tech Dorm is an unusually favorable ratio and ability of two guards to observe what was going on inside the building was quite good. Because of this supervision ratio and the largely unobstructed sight lines, Dr. Ault considered Vo-Tech Dorm to be safer from the standpoint of the potential for an assault than any other segment of DCC. He pointed out that while the single bunked cells of other buildings were safer in a "locked down" condition, they could not be operated on a continually "locked down" basis as a normal course and they

were constructed in such a way that it was difficult for guards to see what was going on on the tiers. Based on Dr. Ault's analysis and the absence of any indication of a history of homosexual violence in the Vo-Tech Dorm,[13] I am not persuaded that there is anything the defendants could have done on June 6th and 7th with respect to housing assignments, that would have reduced the risk of a homosexual attack on Wheeler. In short, while the policies of the Department and DCC did not prevent the assault on Wheeler, that assault occurred despite those policies and not because of them.

In the final analysis, what Wheeler seeks to do is to hold Sullivan and Redman responsible for the fact that overcrowding at DCC did not allow the policies of the Department and the institution to function as intended. He cites a number of cases which suggest that State officials may not cite the unavailability of additional funding as an excuse for violating someone's constitutional rights. I have previously held, however, that a finding of deliberate indifference to a substantial risk of serious injury is a prerequisite to liability in a damage action of this kind and that these defendants cannot be held responsible for the defalcations of others. One cannot assess whether a prison official acted with deliberate indifference to a risk without taking into account the resources with which he or she had to work. In this case, when I take into account the resources available to Sullivan and Redman in June of 1980, I cannot conclude that they were deliberately indifferent to the kind of risk which led to Wheeler's injury.

Finally, I am not persuaded that Sullivan or Redman was in any way responsible for the failure of our State to have adequate facilities in June of 1980 to house inmates sentenced to incarceration. It was not shown that Redman had any responsibility with respect to the provision of additional facilities, and, while Sullivan had responsi-

---

**13.** While Wheeler maintains that Vo-Tech had a poor record, the supporting citation refers only to the McGinnis incident of July 6, 1980, the Wheeler incident of June 7, 1980, and Officer Benson's testimony that he was aware that "fights" had occurred in Vo-Tech.

bility for predicting the need and requesting funding for additional facilities, Wheeler has suggested nothing that he failed to do between October of 1979 and June of 1980 which would have affected the conditions which existed at the time of the assault. Indeed, the record shows that Sullivan during this period established a supervised custody program for the purpose of alleviating the overcrowded conditions in the Delaware correctional system. That step seems inconsistent with deliberate indifference on his part.

### D. Reporting Investigation And Prosecution Of Instances Of Homosexual Rape

■ Wheeler's final argument in support of his assault claim is that the administration of which Sullivan and Redman were important parts took a lax attitude towards the reporting, investigation and prosecution of instances of violence and homosexual rape, that this laxity led to an epidemic of violence and rapes at DCC, and that the combination of the epidemic and the laxity created the perception among predatory inmates that they could act out with little risk of retribution. These defendants were deliberately indifferent to the risk created by their laxity, Wheeler argues, and, but for their indifference, Clayton would not have assaulted him.

Wheeler offered two different types of evidence in support of this contention. First, he offered a compilation by year of the reported incidents of rape and other violence at DCC and of what happened as a result of each such report (e.g., no investigation, internal investigation, police investigation, prosecution, no prosecution). Wheeler then offered the opinion of an expert, based on his evaluation of this data from the records of DCC, that "the prison management had lost control of the institution and that the inmates were running it." Second, Wheeler relies on the evidence concerning the investigation of his own case which he maintains shows a callous indifference to the problem of homosexual rape

at DCC. As I evaluate the record, the evidence concerning the investigation of the Wheeler incident does not support this inference. While I regard the opinion of plaintiff's expert as greatly exaggerated and plaintiff's statistical analysis as materially flawed, the data concerning reports of rapes and attempted rapes at DCC between January 1, 1978 and February 28, 1982 raises a significant question regarding the staff attitude towards homosexual rape prior to 1980. That data can be read to suggest that part of the homosexual rape problem at DCC in 1980, as found by the Governor's Task Force, was an attitude of staff that alleged rape victims were not to be believed and that prison rape was inevitable. I am unwilling on this record to place the blame for such a phenomenon at the feet of Sullivan and Redman, however.

Plaintiff's compilation of data concerning "Homosexual" and "Other Violent Incidents" reported at DCC indicates that 613 such incidents occurred during the sixty-two month period from January 1, 1977 to February 28, 1982. While a rate of slightly under ten "violent" incidents per month may seem shocking at first hearing even for a sizable correctional institution, this statistic must be evaluated in light of the fact that no operational definition of "violence" has been tendered and the fact that the largest categories of such incidents, namely "fight" and "assault", are consistent with the use of minimal force under a wide variety of circumstances. Moreover, the types of "homosexual" and "other violence" included are so disparate that plaintiff's statistical analysis allows one to draw very few inferences about the attitude of the staff and administration at DCC and the Department of Corrections. The included incidents run the gamut from rape, to stabbing, to inciting to riot, to the use of "unnecessary force" by a correctional officer, to the use of teargas to quell an inmate disturbance, to "self-inflicted injury," to "disturbance in Court No. 18." [14]

14. Wheeler argues that the ratio of "violent" incidents to criminal prosecution in the years

1979 through 1981 indicated an indifference to violence. During that period, there were 474

I agree that when prison officials allow inmates to take over the management of a prison and establish a reign of terror, they may be held liable to an inmate who is injured as a result. *See, e.g., Stokes v. Delcambre,* 710 F.2d 1120 (5th Cir.1983). I am not persuaded, however, that DCC was being run by the inmates in June of 1980 or that there was a reign of terror in progress at that time. I base this not only on the weakness of plaintiff's statistical data relating to violence generally, but primarily upon the fact that, if such were the case, the other evidence would surely provide some corroboration of it and the other evidence does not. During trial, I heard extensive testimony from both guards and inmates regarding life at DCC during the relevant period. None of it suggested that the inmates were in control of the institution or that serious violence was a common occurrence. Moreover, as previously noted, the contemporary documentation indicates that the wheels of prison administration operated by staff were still functioning. Finally, the Governor's Task Force, despite its utilization of an undercover investigation within the prison, turned up no evidence of abdication by the prison authorities.

This is not to say that the record does not bear evidence of significant problems at DCC in June of 1980 as well as of administrative failures to solve those problems. The problem of homosexual rape was one such problem. As I have earlier noted, the Final Report of the Governor's Task Force found that this problem persisted at DCC in the Fall of 1980. This record indicates to me, however, that the Administration's response to the problem was sufficient to preclude any finding of indifference on its part in June of 1980.

If one utilizes as an operational definition of a serious homosexual attack those incidents in which an inmate was allegedly raped or forced to engage in homosexual acts and those classified as attempted homosexual rape, I believe plaintiff's data provides a rational basis for evaluating the response of the prison and Department administration to the kind of risk which resulted in Wheeler's injury.[15] Utilizing only this portion of plaintiff's data, one can construct the table set forth in Appendix A.

Neither this table nor any other evidence in the record tells us whether DCC had a high incidence of homosexual violence as compared with other correctional institutions. Plaintiff's expert expressed the view that it was comparatively high while defendants' expert opined that it was not; each acknowledged, however, that there was no helpful comparative data available on reported homosexual violence in institutions across the nation. Appendix A does, however, enable one to draw some tentative inferences about the attitude at DCC towards homosexual violence.

Throughout the entire sixty-two month period, reports of homosexual violence were not ignored by the staff. In virtually every instance, an investigation was conducted and records were kept. While the

reported incidents of alleged "homosexual" and "other violence" at DCC and only nine of these led to criminal prosecutions. Given the kinds of incidents included in these categories, however, the fact that prosecutors elected to go forward only nine times, in and of itself, is not very probative on the issue of indifference.

**15.** The parties and their experts have debated at length about the underreporting and overreporting of homosexual aggression in prison populations. I am confident that many inmate victims of homosexual aggression, facing the risk of retaliation or the restrictions of protective custody, chose not to report the problem to corrections staff. At the same time, I am confident that false accusations of such conduct are utilized by some inmates as retributive or manipulative tools. While I would guess that underreporting is more prevalent than overreporting by a wide margin, there is no empirical data to support this guess or to provide a basis for estimating the amount of underreporting. There is evidence of greater probative value, however. While the total amount of homosexual violence, including unreported episodes, would be relevant to Wheeler's theory that indifference produced a situation in which predators acted without fear of retribution, the more probative evidence of whether such indifference in fact existed is the staff and administration responses to those instances of alleged homosexual violence which were brought to their attention.

Interim Report was critical of the investigative process in the fall of 1979, the very fact that prison authorities insisted on investigations being conducted and reports being written suggests that they were not indifferent to the problem. Moreover, beginning in 1980, the State Police or the Attorney General's Office was notified and an external investigation conducted in a majority of the reported cases.

On the other hand, during the three years from 1977 through 1979, not one of the sixteen alleged rapes or attempted rapes were referred to the outside authorities for investigation and possible prosecution. While this is a relatively small sample, it provides some support for the inference that those conducting the internal investigations were either highly skeptical of the accounts of victims or considered such incidents to be unavoidable and, accordingly, not worth the attention of the outside authorities.

Based on this data, one clearly cannot attribute any insensitivity or indifference to homosexual violence that may have existed at DCC in June of 1980 to Commissioner Sullivan. As earlier noted, he was not appointed until October of 1979 and the data suggests that his first fourteen months in office brought an alteration in policy which produced a marked increase in medical exams, emergency transfers, and referrals for external investigation and possible criminal prosecution. While Wheeler stresses that there were no prosecutions from January of 1980 through February of 1982, despite sixteen reported cases, this is not highly probative of Sullivan's attitude towards homosexual violence. As far as the ten cases referred for external investigation and possible prosecutions are concerned, there is no reason to believe Sullivan played any role in the decision to prosecute or not prosecute. With respect to the remaining six, there are a number of legitimate reasons why the investigating officers may have decided not to refer and the evidence suggests that Sullivan would not in any event have been familiar with the facts of those particular cases.

The picture with respect to Warden Redman is more clouded. He received reports of all investigations at DCC and he must have been aware that, during 1977 through 1979, none of the sixteen reported cases were referred for external investigation and possible criminal prosecution. One possible explanation for his failure to step in and direct referrals is indifference on his part to the problem of homosexual violence. It is not the only explanation, however, and one must evaluate his conduct in light of the fact that he had a system in place which resulted in every report being investigated by a prison official having authority to refer it to the outside authorities. Redman's conduct must also be evaluated in the light of the other record evidence tending to show that Redman had systems in place and working, despite difficult circumstances, to reduce risks of this kind to inmates.

I view the institution's handling of Wheeler's own report of homosexual violence as supporting the proposition that the investigating officers were far from indifferent to such violence and as providing no evidence of such indifference on the part of either Redman or Sullivan. The evidence showed that Wheeler reported the assault to Officer Chudzik on the evening of June 7th, and that Chudzik responded by getting Wheeler's version of the facts, reporting the incident to his superiors, and taking Wheeler to the prison hospital promptly for an examination. Wheeler was then allowed to remain in the hospital. The State Police were immediately notified and brought into the investigation, and two of DCC's highest officials—Captain Redden and Security Chief Pippin—came to the prison to help conduct the investigation. These two men and State Police Officer Quashne questioned Wheeler, Clayton, and others. The investigation continued late into the night and was resumed at 10:00 A.M. the next morning by Redden, Pippin and State Police Officer Hadley. This was followed up by a polygraph that Wheeler originally asked to take. As a result of the investigation, Wheeler was put on protective custo-

dy and Clayton was immediately transferred, and later reclassified, to maximum security. It is not suggested that the decision not to prosecute Clayton criminally was made by anyone associated with the Department of Corrections.

Wheeler finds fault with the investigation primarily in three areas: he was subjected to what he perceived as harsh questioning about whether he was a homosexual and whether he was telling the truth, his interrogators would not believe him, and he believes no one from the prison advised the State Police of Clayton's reputation as an aggressive homosexual. If one believes Wheeler's account of the assault, as I do after two weeks of trial, one can understand his resentment of his interrogation and the unwillingness of the investigators to believe his story. The investigators had reason to be skeptical about his account, however; his report came a day late, included a material falsehood, and was accompanied by inmate testimony tending to indicate that he was trying to manipulate the system. The investigators' questions were relevant and, given the surrounding circumstances, I do not believe the manner in which they were pressed indicates deliberate indifference to homosexual violence. Finally, while it is true that no one has a specific recollection of discussing Clayton's background with Quashne or Hadley, given the interviews of Clayton and Favors and the temporal proximity of the McGinnis incident, I cannot believe that Clayton's homosexuality and aggressiveness were not discussed on the evening of June 7th. To believe otherwise would require a conclusion that Redden, who was familiar with Clayton and conducted the McGinnis investigation, deliberately suppressed this information. I do not so conclude.[16] But even if one were to assume *arguendo* that the investigation of Wheeler's complaint evidenced indifference on the part of the investigators, Redman played no role in that investigation.

Accordingly, as I view the matter, the issue resolves itself into whether the failure of DCC to refer any of the reported incidents of homosexual violence during 1977 through 1979 for possible criminal prosecution is alone sufficient to support a judgment against Redman on Wheeler's assault claim. While I find this evidence troubling, I nevertheless believe, based on all of the evidence, that Warden Redman was genuinely concerned about the personal security of the inmates in his institution in the 1977 to 1979 period as well as from 1980 on. Moreover, even if Redman's failure to intervene during the earlier period be attributed to indifference on his part, the proximate cause issue would remain. Given the turn around in the management of the affairs of the Department following Commissioner Sullivan's appointment and the aggressive manner in which Wheeler's complaint was investigated, I think it unlikely that any apathy towards homosexual aggression which may have existed in the 1977 to 1979 period played any role in the decision making of predatory inmates in June of 1980.

## IV. THE CONDITIONS OF CONFINEMENT CLAIM

An analysis of Wheeler's claims that he was confined under conditions which constituted cruel and unusual punishment should begin with the Supreme Court's opinion in *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). In that case, the Court considered "for the first time the limitation that the Eighth Amendment ... imposes upon the conditions in which a State may confine those convicted of crimes." *Id.* at 344–45, 101 S.Ct. at 2397–98. The Court refused to set out a hard and fast rule by which to judge whether conditions of confinement are cruel and unusual. Rather, the Court said that "the Eighth Amendment 'must draw its meaning from the evolving standards of decency that mark the progress of a free society'" [citations omitted]. *Id.* at 346,

---

16. If Redden made a deliberate decision to suppress this information, that fact would tell us little about Redman's attitude towards homosexual violence.

101 S.Ct. at 2399. The Court then went on to characterize the circumstances under which such conditions might constitute cruel and unusual punishment.

Conditions must not involve the wanton and unnecessary infliction of pain, nor may they be grossly disproportionate to the severity of the crime warranting imprisonment. In *Estelle v. Gamble*, [429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)], we held that the denial of medical care is cruel and unusual because, in the worst case, it can result in physical torture, and, even in less serious cases, it can result in pain without any penological purpose. 429 U.S. at 103 [97 S.Ct. at 290]. In *Hutto v. Finney*, [437 U.S. 678, 679, 98 S.Ct. 2565, 2568, 57 L.Ed.2d 522 (1978)], the conditions of confinement in two Arkansas prisons constituted cruel and unusual punishment because they resulted in unquestioned and serious deprivations of basic human needs. Conditions other than those in *Gamble* and *Hutto*, alone or in combination, may deprive inmates of the minimal civilized measure of life's necessities. Such conditions could be cruel and unusual under the contemporary standard of decency that we recognized in *Gamble, supra,* [429 U.S.] at 103–04 [97 S.Ct. at 290–91]. But conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional. To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society.

*Rhodes v. Chapman, supra,* at 347, 101 S.Ct. at 2399.

The other Eighth Amendment principle which is of importance in the context of the evidence in this case is that the length of confinement in a given set of conditions is an important element in determining whether the constitutional standard has been breached. As the Supreme Court observed in *Hutto v. Finney*, 437 U.S. 678, 679, 686–87, 98 S.Ct. 2565, 2568, 2571–72, 57 L.Ed.2d 522 (1978):

"[T]he length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards. A filthy, overcrowded cell and a diet of 'grue' might be tolerable for a few days and intolerably cruel for weeks or months."

The *Hutto* case is important here because the conditions endured by Wheeler which come the closest to the cruel and unusual punishment standard were endured for very short periods of time. The worst conditions by far were the conditions which Wheeler experienced in the receiving area in the fall of 1981. He was in that area less than three days, however, and, for that reason alone, I conclude that this experience did not violate Wheeler's Eighth Amendment rights. I reach the same conclusion with respect to his three day stay in the Ram Room in November of 1981 and his overnight placement in an isolation cell on December 22 and 23, 1981, although the later two experiences were not nearly as onerous as that in the receiving room.

The record supports Wheeler's claim that overcrowding in the Receiving Room in the fall of 1981 resulted in living conditions which no one should be asked to bear for long. With the exception of Wheeler's own testimony, however, the record does not support his contention that the infirmary and maximum security areas were filthy and health threatening. When Wheeler originally filed this suit he complained only of the overcrowding and made no mention of the other claims included in his trial testimony. While I have no doubt that conditions in both areas were not pleasant, I believe Wheeler's testimony concerning these areas to be greatly exaggerated. If the conditions he described had in fact existed, one would expect that corroborating evidence from other inmates would have been available.

Neither Wheeler's confinement in Maximum Security from September to November, 1980, and December, 1981 to February 1982, nor his stays in the infirmiry from June to September 1980 and November to December, 1981 involved the wanton and unnecessary infliction of pain or deprived

Wheeler of a minimal measure of life's necessities.

## V. THE DUE PROCESS CLAIM

█ Wheeler spent the night of December 22, 1981 in an isolation cell in the Maximum Security Building and the three days from November 2 to November 5, 1981 in the Ram Room of the Infirmary. In neither instance was he given a hearing before being transferred. The parties differ on whether hearings were necessary, but those issues need not be addressed. Wheeler does not contend that Sullivan, Redman or Jones participated in either of these transfers or that any of them even knew about Wheeler's confinement at those locations. Wheeler argues affirmatively that those causing the transfers acted in violation of the rules which the administration had adopted for the institution. While Wheeler also argues that the defendants failed to enforce their own rules, there is no evidence in this record from which I could conclude that there was a practice of violating the rules relating to hearings. Under these circumstances, it cannot be said that any of the defendants participated or acquiesced in a violation of Wheeler's rights under the Due Process Clause.

## VI. THE STATE LAW CLAIMS

Finally, Wheeler asserts that the conditions at DCC during his tenure constituted a breach of the defendants' duties under the Delaware Constitution, certain Delaware statutes, and Delaware's common law.

Section 11 of Article I of the Delaware Constitution generally tracks the Eighth Amendment to the United States Constitution:

Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted; and in the construction of jails a proper regard shall be to the health of prisoners.

Wheeler has cited no Delaware case construing Section 11 in the context of a claim regarding conditions of confinement. In other contexts, however, the Supreme Court of Delaware, when applying Delaware's cruel and unusual punishment clause, has followed the lead of the Supreme Court of the United States and has adopted the Eighth Amendment case law.[17] I predict that the Supreme Court of Delaware will do likewise in suits of this kind and since I have already determined that Wheeler's Eighth Amendment claim fails, it follows that his claim under Section 11 of Delaware's Constitution must fail as well.

Wheeler also argues that the defendants breached duties owed to him under a number of state statutes which govern the administration of Delaware's correctional system.[18] He does not, however, specify how they have done this. I surmise that Wheeler contends that these statutes impose a duty to defendants to maintain a classification system which would assure the separation of potential predators and potential prey. In their context, however, it is difficult to construe these sections as intended to impose a duty to maintain an effective classification system in face of overcrowding which renders that task impossible. Section 6502(d) of the same chapter, for example, provides:

In the event that: (1) The number of persons housed by the Department at any of its facilities exceeds the design capacity of that facility; and (2) because the inmate population at that facility exceeds the design capacity of that facility the Department is unable to provide conditions of confinement as may otherwise be required by its title or by the regulations promulgated by the Department, then the Department shall not be required to provide said conditions of confinement to the extent it is unable to do

---

**17.** *See, e.g., State v. Dickerson,* 298 A.2d 761, 767–68 (Del.1973); *State v. Sheppard,* 331 A.2d 142 (Del.1974).

**18.** 11 Del.C. §§ 6502(a), 6504(8), 6523, 6530 and 6531.

so because of the inmate population at that facility....

Finally, Wheeler contends that the defendants breached their common law duty to care for him while he was in their custody "by recklessly allowing him to be homosexually assaulted." For the reasons I have already discussed, however, I conclude that the assault upon Wheeler was not occasioned by any reckless or even negligent conduct of any of the defendants.

## VII. CONCLUSION

The plaintiff in this action was a victim of a homosexual rape on June 7, 1980 while an inmate at the Delaware Correctional Center. Tragically, his misfortune was not an isolated occurrence at that time and place. I have concluded, however, that the assault upon plaintiff occurred, and the problem of homosexual violence existed at DCC, in spite of the efforts of Commissioner Sullivan and Warden Redman rather than because of any indifference on their part. Since Bureau Chief Jones, the only other defendant, was not employed by the Department of Corrections in June of 1980, judgment must be entered against plaintiff on his assault claim.

I also conclude that the conditions of Wheeler's confinement at DCC did not at any time constitute cruel and unusual punishment and that any violation of his right to due process of law is not the responsibility of any of these defendants.

Finally, I find no violation of plaintiff's rights under the Constitution and laws of the State of Delaware. Judgment will be entered for the defendants.

APPENDIX A
REPORTED INCIDENTS OF ALLEGED
RAPE AND ATTEMPTED RAPE AND
INSTITUTIONAL FOLLOW-UP AT D.C.C.
1977–1982

|  | 1977 | 1978 | 1979 | 1980 | 1981 | 1982 (Jan. & Feb.) |
|---|---|---|---|---|---|---|
| Approximate Average Prison Population | 600 | 650 | 750 | 900 | 900 | |
| Attempted Rape Incident Reports | 2 | 0 | 1[4] | 0[6] | 2[7] | 0 |
| Rape Incident Reports | 3 | 3 | 7[5] | 11 | 2 | 1 |
| Internal Investigations[1] | 5 | 3 | 8 | 8 | 3 | 1 |
| Medical Examinations | 4 | 1 | 3 | 10 | 2 | 1 |
| External Investigations[2] | 0 | 0 | 0 | 7 | 2 | 1 |
| Emergency Transfers[3] | 1 | 2 | 5 | 10 | 1 | 0 |
| Criminal Prosecutions | 0 | 0 | 0 | 0 | 0 | 0 |

[1] Interviews conducted and reports written by staff.

[2] Matter reported to and investigation conducted by Delaware State Police or the Attorney General's office.

[3] Immediate transfer of alleged victim or assailant to another section of the institution.

[4] Does not include six reports described as "Homosexual Assaults" without further explanation. In three of these cases there was an internal investigation.

[5] Includes a report of two homosexual assaults in which an inmate was forced to engage in homosexual acts.

[6] Does not include six reports described as "homosexual related assaults" or "homosexual assault" without further description. In these six incidents there were five internal investigations and three external investigations.

[7] Does not include ten incidents described as "homosexual assault" without further description. In these incidents there were six internal and six external investigations.